UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION

| | |
|---|---|
| In Re:<br><br>FAIRMONT GENERAL HOSPITAL, INC.,<br><br>Debtor. | Case No. 1:13-bk-01054<br><br>Chapter 11<br><br>Joint Administration Requested |
| In Re:<br><br>FAIRMONT PHYSICIANS, INC.,<br><br>Debtor. | Case No. 1:13-bk-01055<br><br>Chapter 11<br><br>Joint Administration Requested |

## AFFIDAVIT OF ROBERT C. MARQUARDT IN SUPPORT OF FIRST DAY MOTIONS FOR RELIEF

I, Robert C. Marquardt, hereby state that the following is true to the best of my knowledge, information, and belief.

1. I am the president and the chief executive officer of each of the above-referenced debtors (collectively, the "Debtor" or the "Debtors") and am familiar with the Debtor's assets and liabilities, operations, and business affairs. I have held such positions since 2009. Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtor's industry, operations, and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Affidavit on behalf of the Debtor.

2. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). To enable the Debtors to operate effectively and preserve the value of estate assets, the Debtors have requested various types of relief in "first-day" applications and motions filed with this Court contemporaneously herewith (the "First Day Pleadings").

3. I submit this Affidavit in support of the First Day Pleadings. Any capitalized term not defined herein shall have the meaning ascribed to such term in the relevant First Day Pleadings. The First Day Pleadings seek, among other things, to: (a) ensure the continuation of the Debtor's cash management systems and other business operations without interruption; (b) maintain employee morale and confidence; (c) maintain the Debtor's current level of high quality patient care; and (d) establish certain other administrative procedures to promote a smooth transition into Chapter 11. Gaining and maintaining the support of the Debtor's employees, patients, vendors, and other key constituencies, as well as maintaining the day-to-day operations of the Debtor's business with minimal disruption, will be critical to the Debtor's successful reorganization.

4. Part I of this Affidavit describes the Debtor's business and the circumstances surrounding the filing of the chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Pleadings. Part III concludes that the relief requested in the First Day Pleadings is in the best interest of the Debtors, their creditors and estates, and therefore should be granted.

## PART I: BACKGROUND

5. Fairmont General Hospital, Inc. ("FGH") is a not-for-profit 501(c)(3) corporation organized under the laws of the State of West Virginia. FGH operates a 207-licensed-bed acute care hospital (the "Hospital") located at 1325 Locust Avenue in Fairmont, West Virginia. The

Hospital is accredited by both The Joint Commission and the American College of Surgeons Commission on Cancer. FGH also operates a separate facility (the "HealthPlex") located at 51 Southland Drive in Fairmont, West Virginia. The Hospital provides a comprehensive range of acute, sub-acute ambulatory, emergency, and ancillary services, including cardiac catheterization, ambulatory surgical services, diagnostic imaging (including MRI, PET, and CT scanning), obstetrics, behavioral medicine, home health, and orthopedics. Fairmont General Hospital's South Marion facility (the "HealthPlex"), houses physical, occupational, and speech therapy services, cardiac rehabilitation, limited radiology services, physician offices, and a retail wellness and fitness center.[1]

6. FGH has one (1) wholly-owned operating subsidiary affiliate: Fairmont Physicians, Inc. ("FPI"), d.b.a. Fairmont Physicians Network ("FPN"). FPI has also filed a chapter 11 petition contemporaneously with the filing by FGH.[2] FPI employs the physicians in eleven (11) practices owned or controlled by the Hospital and provides clinical and office space for the practices.

7. The origins of the Hospital date back to the early 20th century with the establishment of Cook Hospital. In the 1930s, the Cook Hospital property was transferred to the City of Fairmont, which, thereafter, owned and operated the Hospital and controlled the Hospital's board of directors. The oldest part of the Hospital building still in use was opened in 1939. Subsequent additions and renovations to the Hospital building were made in 1952, 1972, 1987, 1993, and 2010. In 1985, the Hospital was reorganized as an independent non-profit

---

[1] Portions of the HealthPlex building have been conveyed to third-party owners as office condominiums and are no longer owned by FGH. FGH still owns one (1) condominium unit in the building, which comprises approximately 80% of the space.
[2] Fairmont General Hospital, Inc. and Fairmont Physicians, Inc. may be referred to hereafter as either the "Debtor" or the "Debtors." Use of the singular should be read to include the plural and *vice versa*, unless the context requires otherwise.

3

corporation and has operated as such since then. However, the Hospital buildings and campus (but excluding the HealthPlex) are still owned by the City of Fairmont, and FGH leases the Hospital property for $100 per year under a long term lease that is very favorable to FGH.

8. FGH currently employs approximately 740 full and part-time employees, including approximately 30 physicians, who are employed by FPI. There are 68 physicians with admitting privileges at the Hospital, including the physicians employed directly by the Hospital (through FPI). FGH is the fourth largest employer in Marion County, West Virginia.[3] During 2012, there were approximately 2,900 acute care and 1,600 behavioral discharges from the Hospital, and there were approximately 173,000 outpatient visits, including emergency department visits. The Debtor's annual net patient revenues for 2013 are expected to total approximately $83,000,000.

9. Beginning in 2008, and the Debtor began to experience recurring operating losses and cash flow concerns, attributable to the following events and conditions affecting the Debtor's operations:

> a. **Reimbursement Issues:** FGH and its affiliates remain at a disadvantage with regard to reimbursement. Commercial payers (i.e. Blue Cross, Cigna, Humana, etc.) are not generally interested in providing their best reimbursement rates to a stand-alone, independent, medium-sized hospital such as FGH. Rather, these entities negotiate from a position of significant power relative to independent hospitals such as FGH. And, while negotiations with major payers have yielded 2013 year-to-date net revenue increases of $4.9 million over the same period in 2012, rate increases from 2003 to 2010 barely kept pace with inflation.

---

[3] The largest employers are the Marion County Board of Education, CONSOL Energy, and Fairmont State University.

b. **Expense Issues:** Similar to reimbursement, providers of products and services are not routinely willing to offer the lowest prices to independent community hospitals in FGH's size range. And, while significant progress has been made in improving FGH's operating margin by improving revenues and reducing costs, efforts at reducing costs even further must continue.

c. **Labor Contracts:** With regard to expenses, FGH is under considerable competitive pressure due to its current labor contracts with two unions, Local 1199 of the Service Employees International Union ("SEIU") and Local 550 of the Retail, Wholesale and Department Store Union.[4] Although competitive with other area hospitals with respect to base salaries and wages, FGH's benefits packages with both unions are significantly more costly than benefits packages offered by competitor hospitals locally, regionally, and nationally. These costs are a significant factor in FGH's past and continuing operating losses.

d. **Competing Hospitals and other Health Care Service Providers:** In October 2010, United Hospital Center ("UHC") completed a $300+ million construction project and opened a new hospital less than ten (10) miles from FGH. This event resulted in the immediate loss of Medicare Sole Community Hospital payments to FGH totaling approximately $3 million annually. Shortly thereafter, UHC recruited the only urologist servicing the FGH service area. This loss impacted FGH by approximately $3.6 million annually. In 2011, MedExpress opened an Urgent Care Center in Fairmont, less than two (2) miles from FGH. The impact of this facility has been a gradual reduction of FGH Emergency Department volume

---

[4] In general, Local 1199 of the SEIU represents the skilled nursing and technical staff, and Local 550 represents the non-professional staff (in the areas of housekeeping, maintenance, food services, etc.)

5

and revenue. Referrals to Ruby Memorial Hospital and Mon General Hospital (both in Morgantown) continue. Each hospital derives approximately 12% of its volume from the FGH service area. While efforts have been underway since 2009 to recruit and employ physicians to stop the "out-migration" of business to these competitors, the full positive impact of such efforts has yet to materialize fully.

e. In 2006, FGH made an ill-conceived decision to build the HealthPlex. At that time, prior FGH leadership sought to gain a competitive advantage in the market by providing the fitness, ancillary, and physician services in a more-visible campus located in the southern part of Marion County, adjacent to a major interstate highway interchange servicing Fairmont from the south. The construction of the facility ran significantly over-budget and absorbed considerable financial capital of FGH. The HealthPlex was not projected to provide any free cash-flow for five (5) years and, ultimately, this decision eliminated any and all debt capacity the Hospital would ultimately need for growth and investment going forward.

f. A significant factor in the Debtor's current financial situation is that FGH has been unable to fund the Hospital's extensive long-term capital expenditure ("CAPEX") needs.

10. In approximate amounts, the Debtor's current debt structure (not including leases and other contractual obligations), projected at August 31, 2013, consists of the following:

a. Vendor payables: $8,400,000
b. Bond debt (Marion County – Series 2007) $12,065,000
c. Bond debt (WV Hospital Finance Auth. – Series 2008) $2,675,000

6

    d.  Disputed vendor and contract obligations     $3,300,000

    e.  Medicare reimbursement obligations (2012 and 2013)     $196,000

    f.  Medicaid reimbursement obligations (2012)     $1,685,000

    g.  Medicaid reimbursement obligations (2003-2011; 2013)     $2,450,000

11.    FGH has relatively limited assets on its balance sheet. The bulk of the medical equipment used by the Hospital either is the subject of capital leases or financing agreements or is of such an age that it has been fully depreciated and is of limited liquidation value to the Debtor's estate. FGH's gross accounts receivable total approximately $32,000,000, with allowances and bad debt reserves of $22,000,000. As noted above, FGH does not own the Hospital real property; it owns only a portion of the HealthPlex facility and an undeveloped 6-acre tract of land in Fairmont. The "book value" of these assets on FGH's balance sheet is $13,936,233 and $1,169,709, respectively. FGH believes that the actual value of these assets is somewhat less than "book value," however, although appraisals of the real property have been ordered, none has been completed.

12.    I was hired by FGH in 2009 and immediately began addressing FGH's financial issues. When it became apparent that the long-term financial health of FGH was weak, the board of directors began the process of seeking a strategic partner to acquire FGH or enter into an affiliation agreement with it. To that end, the board hired Cain Brothers and Associates, LLC ("Cain Brothers"), an investment banking firm specializing in the health care industry, to locate and negotiate with potential partners for FGH, beginning in late 2011. From November 2011 through the end of 2012, Cain Brothers identified and brought to FGH thirteen (13) potential partners or buyers. Eight (8) of the parties conducted sufficient due diligence to determine that they did not want to pursue more detailed talks with FGH and never submitted any proposal.

Common reasons given by each of those parties for their disinterest in FGH were FGH's unfavorable labor contracts and significant deferred CAPEX needs. Five (5) of the contacts proceeded to more detailed discussions and due diligence, followed by the signing of exclusivity agreements with two (2) parties. However, following more extensive due diligence, no party was willing to enter into an acquisition or affiliation agreement with FGH, due in large part to the structure of the labor contracts, the status of FGH's payables, and concerns related to the significant deferred CAPEX needs of FGH. Virtually all of the five remaining parties indicated that their interest in FGH was tied to FGH's willingness to reorganize in a chapter 11 bankruptcy case. All discussions with potential strategic partners of FGH ended, and FGH terminated the engagement with Cain Brothers.

13. One of the parties expressing the most interest in entering into a strategic affiliation with FGH was West Virginia United Health System, Inc. ("WVUHS"). WVUHS is a not-for-profit entity affiliated with West Virginia University and WVU Hospitals, Inc. Citing the labor contract issues and concerns about the status of FGH's payables, WVUHS stated that it would not be interested in a partnership with FGH unless such a transaction were completed within the context of a chapter 11 case filed by FGH, following the restructure of FGH's debt and contractual obligations. The FGH board gave Mr. Marquardt authority to conduct additional discussions with WVUHS that contemplated a chapter 11 filing as part of the strategic affiliation business plan. Those discussions led to the consideration of an affiliation agreement between the two entities; however, the critical cash flow pressures on FGH forced the filing of the bankruptcy case before an agreement in principle was reached. FGH does not know whether other parties formerly interested in an acquisition of or affiliation with FGH (or new parties) will enter into discussions with the Debtor, now that the bankruptcy case has been filed.

## PART II: FIRST DAY MOTIONS

14. An important (and in many respects critical) element of the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the following pleadings (collectively, the "First Day Motions"):

   a. Debtors' Application to Employ and Retain Spilman Thomas & Battle, PLLC as Attorneys for Debtors (the "Application to Employ STB");

   b. Application of Rayford K. Adams III and Casey H. Howard to Appear *Pro Hac Vice* Pursuant to Local Bankruptcy Rule 2090-1 and LR Gen P 83.02;

   c. Debtors' Application to Employ Gleason & Associates, P.C. as Financial Analyst to the Debtors (the "Gleason Application");

   d. Debtors' Application to Employ and Retain Hammond Hanlon Camp, LLC as Financial Advisors for Debtors (the "H2C Application");

   e. Debtors' Emergency Motion to Schedule Expedited Hearings On Critical First Day Motions;

   f. Debtor's Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Motion");

   g. Debtors' Application for Entry of an Order Authorizing Debtor to Employ and Retain Epiq Bankruptcy Solutions, LLC as Notice, Claims, and Solicitation Agent (the "Noticing Agent Motion");

   h. Debtors' Emergency Motion for an Order Authorizing Disclosure of Patient-Creditor Personal Health Information, and Motion to Modify Noticing Requirements and for Extension of Time to File (i) Supplemental Mailing Matrix and (ii) Limited Schedule "F" Listing Patient Creditors (the "HIPAA Motion");

i. Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion") ;

j. Motion of the Debtors for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedule Extension Motion");

k. Debtors' Motion for an Order Authorizing the Debtor to (A) Continue Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and (C) Maintain Existing Investment Practices (the "Cash Management Motion");

l. Debtors' Motion for an Order Under § 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (B) Approving Proposed Adequate Assurance of Payment, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion");

m. Debtors' Motion of Debtor for an Order (A) Authorizing the Debtors to Pay Certain Prepetition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Pre-Petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Employee Wage Motion");

    n. Debtors' Motion for Entry of Interim Order (A) Authorizing Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363, (B) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) (the "Cash Collateral Motion");

    o. Debtors' Motion for an Order Establishing Procedures for the Assertion of Section 503(B)(9) Claims (the "503(b)(9) Motion"); and

    p. Debtors' Motion for Order to Dispense With Appointment of Patient Care Ombudsman (the "PCO Motion").

15. Generally, the First Day Motions are designed to facilitate: (a) the continuation of the Debtors' existing cash management systems and other business operations without interruption; (b) preservation of vendor relationships; (c) maintenance of employee morale and confidence; (d) maintenance of the Debtor's current level of high quality patient care; and (e) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.

16. I have reviewed the First Day Motions and, to the best of my knowledge, all information contained therein is true and accurate.

17. For the reasons set forth in the First Day Motions, the relief requested in the First Day Motions is vital to the Debtors' successful reorganization and the preservation of the Debtors' bankruptcy estates. As a result, for the reasons set forth in the First Day Motions, the relief requested in the First Day Motions should be granted.

## PART III: CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Motions, the relief sought therein is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the First Day Motions be granted.

I declare under penalty of prejury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Executed this 3rd day of September 2013.

_____
Robert C. Marquardt
President and Chief Executive Officer of the Debtors