Patrick M. Flatley
United States Bankruptcy Judge

**Dated: Monday, May 19, 2014 1:04:32 PM**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| FAIRMONT GENERAL HOSPITAL, ) | Case No. 13-1054 |
| INC., *et al*., ) | |
| ) | Chapter 11 |
| Debtors. ) | |
| ) | Jointly Administered |

## MEMORANDUM OPINION

Fairmont General Hospital, Inc. (the "Debtor"), and District 1199 West Virginia/Kentucky/Ohio, Service Employees International Union ("District 1199"), request a declaration from the court that their November 1, 2013 Collective Bargaining Agreement (the "CBA") was executed in the ordinary course of the Debtor's business under 11 U.S.C. § 363(c)(1) and is consequently an effective agreement under the Bankruptcy Code.[1]

UMB Bank, N.A., as successor indenture trustee with respect to certain hospital revenue bonds (the "Indenture Trustee"), objects on the basis that that the CBA requires court approval because the Debtor is in Chapter 11 and seeks to sell substantially all its assets. The Indenture Trustee asserts that court approval of the CBA should be denied on the grounds that the existence of the CBA may result in a lower sales price for the Debtor's business as potential purchasers may

---

[1] The Debtor originally sought court approval of the CBA pursuant to 11 U.S.C. § 363(b)(1) as a transaction outside of its ordinary course of business. The Debtor stated that this was done because Appendix R to the CBA states: "the Hospital agrees to seek approval of the new collective bargaining agreement by the Bankruptcy Court." (Exhibit 4). At the May 12, 2014 hearing, however, both the Debtor and District 1199 asserted their belief that the CBA was executed in the ordinary course of the Debtor's business under § 363(c)(1) and did not need court approval under § 363(b)(1). The court received evidence and testimony on whether the CBA required court approval under the standards of § 363(b)(1), or if the court could approve the agreement under § 363(c)(1) as being in the ordinary course of the Debtor's business. The court also allowed the parties a period of time to brief the issue following the evidentiary hearing. Because the court finds that the execution of the CBA is in the Debtor's ordinary course of business under § 363(c)(1), the court will not address the standards for approving the agreement pursuant to § 363(b)(1) or the arguments of the parties concerning that issue.

1

not desire to purchase a business with a unionized workforce. In addition, the Indenture Trustee states that the CBA constitutes a settlement agreement under Fed. R. Bankr. P. 9019 which must be approved by the court.

For the reasons stated herein, the court finds that the CBA was executed in the ordinary course of the Debtor's business and is effective under § 363(c)(1) without obtaining court approval. The court also finds that the CBA does not constitute a settlement as contemplated under Rule 9019.

## I. BACKGROUND

The Debtor operates a 207-licensed bed acute care hospital in Fairmont, West Virginia. It has approximately 731 full and part-time employees and 28 physicians. Nearly 340 of these employees are represented by District 1199.

The Debtor and District 1199 executed a collective bargaining agreement on November 1, 2010, which was set to expire on April 30, 2013. By agreement of the parties, the November 1, 2010 Collective Bargaining Agreement was extended to October 31, 2013.

The Debtor filed its Chapter 11 bankruptcy petition on September 3, 2013. On October 3, 2013, the Debtor and District 1199 negotiated a "Settlement Agreement" that set forth the general terms of the parties' labor agreement following October 31, 2013. The October 3, 2013 Settlement Agreement contained better terms for the Debtor as compared to the November 1, 2010 Collective Bargaining Agreement. The October 3, 2013 Settlement Agreement served as the bridge between the contractual termination of the November 1, 2010 Collective Bargaining Agreement and the memorialization of a new collective bargaining agreement that was to be finalized after November 1, 2013, but made effective as of that date:

> This SETTLEMENT AGREEMENT constitutes a full and complete collective bargaining agreement between the parties, which shall commence at 12am on November 1, 2013, and shall remain in full force and effect until midnight on the 31st day of October, 2016.
> . . . .
> The parties will later execute a reformatted "clean copy" of this collective bargaining agreement; however, it is agreed that this Settlement Agreement and the provisions incorporated herein constitute the terms of the Agreement.

(Exhibit 3).

2

District 1199 states that the CBA was not memorialized in a document taking the normal form of a collective bargaining agreement until January 17, 2014. Under Article 38, however, the new CBA was effective "from November 1, 2013, up to and including October 31, 2016." (Exhibit 4). Pursuant to Appendix R of the CBA, the Debtor is required to seek court approval of the CBA. Consequently, on March 17, 2014, the Debtor filed its motion with the court to approve the CBA. The parties have been continuously operating under the CBA since November 1, 2013.

Meanwhile, on May 9, 2014, the Debtor filed its motion for an order to approve the sale of its business to Alecto Healthcare Services Fairmont, LLC. That motion and the sale process is currently pending before the court. Pursuant to Article 37 of the CBA, if the Debtor were to sell the hospital, the Debtor will:

> require the successor to its interest to assume and agree to be bound by all provisions of this Agreement, so long as the successor to the Hospital's interest continues operations on the Hospital's premises.

(Exhibit 4, art. 37).

## II.   DISCUSSION

The Indenture Trustee asserts that court approval of the CBA is required on the grounds that the Debtor has filed a petition under Chapter 11 of the Bankruptcy Code and is actively seeking to sell substantially all its assets. In addition, the Indenture Trustee contends that the CBA is a settlement agreement that requires court approval.

### A.   Ordinary Course of Business

The Debtor and District 1199 have been operating under the CBA for over six months and believe the CBA is effective without court approval as execution of a collective bargaining agreement is a common practice in the hospital industry. The Debtor asserts that its CBA with District 1199 represents a continuation of the Debtor's pre-petition business relationship and is the type of transaction that its creditors would reasonably expect the Debtor to execute given the nature of the Debtor's business.

Debtors in possession operating in Chapter 11 are statutorily authorized to "enter into transactions . . . in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1). In determining what constitutes a transaction in the ordinary course of business, "courts have engaged in a two-step inquiry . . . : a 'horizontal dimension' test and a 'vertical

3

dimension' test." *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (citing Benjamin Weintraub & Alan Resnick, *The Meaning of "Ordinary Course of Business" Under the Bankruptcy Code -- Vertical and Horizontal Analysis*, 19 UCC L.J. 364 (1987)); *see also*; *In re Ohio Valley Amusement Co.*, Case No. 03-50356, 2008 Bankr. LEXIS 3191 at*11-12 (Bankr. N.D.W. Va. Dec. 1, 2008) (applying the vertical and horizontal dimension tests).

The "horizontal dimension" test considers "whether from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Roth Am.*, 975 F.2d at 953. The "vertical dimension" test considers the creditors' expectations and whether the economic risk of the transaction is different from those accepted by creditors that extended credit to the debtor pre-petition. *Ohio Valley Amusement Co.*, 2008 Bankr. LEXIS 3191 at *12. Consonant with the horizontal and vertical dimension tests, the Court of Appeals for the Fourth Circuit in *Bowers v. Atlanta Motor Speedway (In re Southeast Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 158 (4th Cir. 1996), analyzed a post-petition transaction to see whether the type of transaction was a "common practice" in the debtor's industry, and whether a creditor could "reasonably expect" a debtor to enter into that type of post-petition transaction. *See also Devan v. Phoenix Am. Life Ins. Co. (In re Merry-Go-Round Enters.)*, 400 F.3d 219, 226 (4th Cir. 2005) (same).

Regarding the "horizontal dimension," or the common practice in the Debtor's industry, the Debtor presented the testimony of Kevin Carr, the Debtor's labor lawyer,[2] who stated that: (a) hospitals across the country enter into collective bargaining agreements with unions representing hospitals' employees; (b) none of the provisions of the November 1, 2013 CBA were unusual as compared to collective bargaining agreements executed at different hospitals – including the provision in Article 37 imposing successor liability; and (c) the Debtor's November 13, 2013 CBA is generally consistent with market terms. Mr. Carr's testimony regarding collective bargaining agreements in the hospital industry, and comparison of the November 1, 2013 CBA to a general industry collective bargaining agreement, is not contested. The court concludes, therefore, that it is not unusual for hospitals to employ unionized staff to provide labor and to enter into collective bargaining agreements to secure the benefits of a unionized workforce. *See, e.g.*, *In re Anything*

---

[2] Mr. Carr has served as the Debtor's labor lawyer for over 12 years and was the chief negotiator for the Debtor in the execution of three collective bargaining agreements between the Debtor and District 1199.

*Elec. Contrs. Co.*, Case No. 96-10751, 2005 Bankr. LEXIS 3447 at*13-14 (Bankr. N.D.N.Y. Jan. 18, 2005) ("It would not be unusual for electrical contractors to employ union electricians to provide labor and to enter into collective bargaining agreements in order to secure the benefits of a unionized work force."); *In re Leslie Fay Cos.*, 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) ("[A]s a general rule, a debtor whose employees are covered by a collective bargaining agreement is permitted to enter into a new collective bargaining agreement or a modification to an existing agreement post-petition without notice and a hearing.").

Regarding the "vertical dimension" test, the court admitted into evidence Debtor's Exhibit 1, the November 1, 2010 Collective Bargaining Agreement between the Debtor and District 1199. Importantly, the November 1, 2010 Agreement was executed nearly three years before the Debtor filed its bankruptcy petition, it was set to terminate on April 30, 2013, and it was temporarily extended to October 31, 2013. The November 1, 2013 CBA – which offers more advantageous terms to the Debtor – represents a continuation of the Debtor's pre-petition business relationship with District 1199. Creditors of the Debtor must reasonably expect it to employ staff while it operates in Chapter 11 and enter into such employment terms as are ordinary in that industry to avoid labor strife. Consequently, the Debtor has satisfied the vertical dimension test by demonstrating a continuation of a pre-petition business relationship upon common labor terms. *See, e.g.*, *In re Illinois-California Express, Inc.*, 72 B.R. 987, (D. Colo. 1987) (finding the execution of a collective bargaining agreement to be reasonably expected by creditors considering that the collective bargaining relationship in the case was about 30 years old); *In re DeLuca Distributing Co.*, 38 B.R. 588, 593-94 (Bankr. N.D. Ohio 1984) ("Given our national labor policy of encouraging collective bargaining agreements and avoiding labor strife, the court finds the reasonable expectation of creditors is that the debtor will enter into collective bargaining agreements. The debtor's history of union representation supports this conclusion."); *cf.*, *In re Roth Am., Inc.*, 975 F.2d 949, 953 (3d Cir. 1992) (finding that the post-petition collective bargaining agreement was not reasonably expected by creditors because it was "fundamentally different" from the terms of the pre-petition collective bargaining agreement).

The Indenture Trustee asserts, however, that the Debtor's business industry is not all hospitals generally, but only that small subset of hospitals that have filed a Chapter 11 petition

with the intention of selling substantially all their assets. The Indenture Trustee contends that execution of a collective bargaining agreement in advance of a sale is not a common practice for businesses in this smaller industry subset and creditors do not reasonably expect a debtor hospital in the process of consummating a sale of substantially all its assets to enter into a three-year collective bargaining agreement that it knowingly cannot and will not perform beyond a few months. In its view, such an action is inimical to the bankruptcy sale process contemplated by the Debtor.

The Indenture Trustee's argument equates the definition of "industry" to be a process of liquidation in bankruptcy. What constitutes the "ordinary course of business" in the process of selling assets through Chapter 11 of the Bankruptcy Code, however, is not the basis for "ordinariness" under § 363(c)(1). The Indenture Trustee's argument confuses an ordinary course of business transaction for a debtor operating a business under the privileges afforded by Chapter 11 with whether such an ordinary course of business transaction is the best decision for the estate and its creditors. Congress has already statutorily determined through 11 U.S.C. §§ 363(c)(1), 1107(a), and 1108, that debtors in Chapter 11 have the right to exercise the privileges of their Chapter 11 status, which includes the right operate the bankrupt business without a prerequisite of obtaining creditor and/or court approval of ordinary business transactions. *In re Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("Where the debtor in possession is merely exercising [its] right to exercise the privileges of its Chapter 11 status, which include the right to operate the bankrupt business, there is no general right to notice and hearing concerning particular transactions.").

The Indenture Trustee cites to *In re Crystal Apparel, Inc.*, 220 B.R. 816, 831-32 (Bankr. S.D.N.Y. 1998), to support its position that the court must take into consideration the "changing circumstances inherent in hypothetical creditor expectations" to determine whether "'the nature of the [transaction] ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken in the circumstances.'" (citation omitted) This language, the Indenture Trustee contends, directs the court to consider the fact that the Debtor in this case is attempting to sell substantially all its assets and hypothetical creditors of the Debtor should not be deemed to reasonably expect the Debtor to execute a 3-year collective bargaining agreement in advance of a contemplated sale.

*Crystal Apparel* is consistent with the general theory that post-petition agreements that would otherwise fall within the ordinary course of the debtor's business nevertheless require court approval when the result of the agreement is inimical to the theory or philosophy of the Bankruptcy Code. *See, e.g.*, *In re Hillard Dev. Co.*, Case No 90-27588, 2004 Bankr. LEXIS 931 at*3 fn. 1 (Bankr. S.D. Fla. April 16, 2004) ("The only time post-petition collective bargaining agreements require court approval is when they obligate the debtor to do something 'extraordinary, such as giving the union a lien on the debtor's property, or to do an act which is inimical to the theory and philosophy of the Code, such as the payment of pre-petition indebtedness.'") (citation omitted). More specifically, in *Crystal Apparel*, the court addressed so-called "golden parachutes" for the bankrupt business's executives. 220 B.R. at 833 ("[I]t is inimical to the policies of the Bankruptcy Code to so prefer top management without notice to creditors."). *Crystal Apparel* was decided in 1998. In 2005, Congress enacted 11 U.S.C. § 503(c) to statutorily address the issue of executive compensation in bankruptcy. 2005 Pub. L. No. 109-8, § 331 (2005). Consequently, the court does not believe that *Crystal Apparel* attempts to change the "ordinariness" standard of for a business that files bankruptcy; rather, the court finds that *Crystal Apparel* stands for the proposition that "golden parachute" agreements for executive compensation require court approval because such agreements are inimical to the philosophy and theory of the Bankruptcy Code.

Moreover, the court notes that, in this case, the Debtor filed its Chapter 11 petition on September 3, 2013. One month later, it executed the October 3, 2013 Settlement Agreement that was later reformatted into the November 1, 2013 CBA. While the Debtor may have been contemplating a sale of its business as of October 3, 2013, at that time no one could accurately predict whether or when the Debtor would succeed in attracting a bona fide purchaser, obtain approval of the proposed sale, close the sale, and transfer the assets. In fact, as of the date of this memorandum opinion, a sale of the Debtor's business still has not occurred and approximately 7 of the 36 months of the CBA's term have expired. Without execution of the October 3, 2013 Settlement Agreement and the November 1, 2013 CBA, the Debtor may have exposed itself to significant labor problems which may have resulted in a depressed sale value. The Indenture Trustee's contention that the November 1, 2013 CBA chills potential bidding and may result in a depressed sale value is just as speculative. At bottom, however, when considering the facts of

this case, the court finds nothing in the November 1, 2013 CBA that is inimical to the theory or philosophy of the Bankruptcy Code, or to the Debtor's proposed course of action while in Chapter 11, such that it would require the Debtor to obtain court approval of the CBA.

Therefore, the court finds that the November 1, 2013 CBA was executed in the Debtor's ordinary course of business and is valid without court approval as it constitutes the type of transaction contemplated by 11 U.S.C. § 363(c)(1).

### B. Settlement under Rule 9019

The Indenture Trustee asserts that the October 2013 Settlement Agreement negotiated between the Debtor and District 1199 constitutes a settlement under Fed. R. Bankr. P. 9019 and that the Debtor failed to introduce evidence that the Rule 9019 settlement is in the best interest of the Debtor's bankruptcy estate.

Under Rule 9019, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." A court reviews a Rule 9019 motion to compromise against "the outcome of four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Buffalo Coal Co.*, No. 06-366, 2006 Bankr. LEXIS 3076 at *12 (Bankr. N.D.W. Va. Nov. 15, 2006) (citing *Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159, 165 (3d Cir. 2003)); *see also Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424-25 (1968) (stating that, in determining whether a compromise is fair and equitable, a bankruptcy judge should form "an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained . . . . Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.").

Importantly, as evident from the standards used to consider the approval of a compromise or settlement, Rule 9019 requires a claim or cause of action by one party against another: Rule 9019 does not include within its scope ordinary business decisions and negotiations. For Rule 9019 to apply, a claim or cause of action must exist for which the parties subsequently agree to accept compensation that is different from what might be gained after a trial on the merits.

Here, the Debtor and District 1199's November 1, 2010 Collective Bargaining Agreement expired by its terms on April 30, 2013, and was extended by agreement to October 31, 2013. Thus, unless further action was taken by the parties, on November 1, 2013, the Debtor and District 1199 would not have any formal labor agreement. The October 3, 2013 Settlement Agreement contains the following important terms:

> This SETTLEMENT AGREEMENT constitutes a full and complete collective bargaining agreement between the parties, which shall commence at 12am on November 1, 2013, and shall remain in full force and effect until midnight on the 31st day of October, 2016.
>
> . . . .
>
> The parties will later execute a reformatted "clean copy" of this collective bargaining agreement; however, it is agreed that this Settlement Agreement and the provision incorporated herein constitute the terms of the Agreement.

(Exhibit 3).

The contents of the October 3, 2013 Settlement Agreement demonstrate that the Debtor and District 1199 were not compromising or settling claims arising out of the November 1, 2010 Collective Bargaining Agreement; rather, the old agreement was expiring based on its contractual terms and the October 3, 2013 Settlement Agreement was the bridge that governed the parties' relationship after October 31, 2013, until such time as a reformatted, clean copy of new agreement could be finalized. The new agreement was finalized on January 17, 2014, and made retroactively effective to November 1, 2013 consistent with the terms of the Settlement Agreement. Kevin Carr testified that no claim or cause or action was compromised or settled in the CBA.

The Indenture Trustee cites one motion and one case in support of its argument that modifications to a collective bargaining agreement require court approval under Rule 9019, both of which are distinguishable. *In re Patriot Coal Co.*, 12-51502, Doc. No. 4460, p.5 (Bankr. E.D. Mo. Aug. 13, 2013); *In re Git-N-Go, Inc.*, 322 B.R. 164 (Bankr. N.D. Okla. 2004).

In *Patriot Coal Co.*, the Indenture Trustee cites to a motion in case docket that was filed by the debtor company. The document requests court approval of new collective bargaining agreements under Rule 9019. In the motion, the debtor company specifically states that it worked to negotiate modifications to existing agreements, *id.* at ¶ 5, it was compromising a cause of action for rejection of the agreements and their breach, *id.*, and the motion "resolved contentious and

complex ongoing appellate litigation." *Id.* at ¶ 18.

Similarly, in *Git-N-Go, Inc.*, the court determined that a post-petition contract between Git-N-Go and its armored car service compromised a $57,000 pre-petition contract claim of the armored car service against the bankruptcy estate. 322 B.R. at 175. The court determined that its approval was required under Fed. R. Bankr. P. 9019 because the post-petition contract was a compromise of existing, pre-petition litigation claims.

In this case, no party has pointed to any term in the October 3, 2013 Settlement Agreement or the November 1, 2013 CBA that demonstrates the settlement of pre- or post-petition claims arising between the Debtor and District 1199 for which a motion to compromise or settle under Rule 9019 would be required. The only evidence and testimony elicited was that the October 3, 2013 Settlement Agreement and the November 1, 2013 CBA constituted a new agreement between the Debtor and District 1199 that followed the expiration of the then-existing collective bargaining agreement and that no existing claims were being resolved through that process. Both *Patriot Coal* and *Git-N-Go* are factually inapposite.

### III. CONCLUSION

For the above-stated reasons, the court will enter a separate order that declares the execution of the November 1, 2013 CBA to be a transaction in the ordinary course of the Debtor's business under 11 U.S.C. § 363(c)(1) that is valid and effective as executed.