**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

| | |
|---|---|
| **In re** | Case No. 1:13-bk-01054 |
| **FAIRMONT GENERAL HOSPITAL, INC.,** | Chapter 11 |
| **Debtor.** | Jointly Administered |
| **In re** | Case No. 1:13-bk-01055 |
| **FAIRMONT PHYSICIANS, INC.,** | Chapter 11 |
| **Debtor.** | Jointly Administered |

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF ORDERLY
LIQUIDATION PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

/s/ Rayford K. Adams III
Rayford K. Adams III (N.C. Bar No. 8622)
SPILMAN THOMAS & BATTLE, PLLC
110 Oakwood Drive, Suite 500
Winston-Salem, North Carolina 27103
tadams@spilmanlaw.com

/s/ Michael S. Garrison
Michael S. Garrison (W.V. Bar No. 7161)
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800 (26501)
P.O. Box 615
Morgantown, WV 26507
mgarrison@spilmanlaw.com

*Counsel for the Debtors*

/s/ Andrew Sherman
Andrew Sherman (N.J. Bar No. 042731991)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza, Newark, NJ 07102
asherman@sillscummis.com

*Counsel for the Official Committee of
Unsecured Creditors*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

II.     DESCRIPTION OF THE DEBTORS' BUSINESSES AND REASONS FOR
        THE DEBTORS' CHAPTER 11 FILINGS ......................................................... 3

      A.      The Debtors........................................................................................ 3

      B.      History of the Hospital....................................................................... 3

      C.      Hospital Bonds and Funding Mechanism .......................................... 4

      D.      Events Leading to Chapter 11 Filings................................................ 4

      E.      Significant Events During the Bankruptcy Cases .............................. 6

III.    SUMMARY OF THE PLAN .............................................................................. 11

      A.      Introduction...................................................................................... 11

      B.      Voting Procedures and Confirmation Requirements ......................... 12

      C.      Confirmation Procedure.................................................................... 14

      D.      Classification of Claims and Interests and Their Treatment Under the Plan....... 16

      E.      Estimated Range of Potential Recoveries for Impaired Classes of Claims ........ 23

      F.      Means for Execution of the Plan....................................................... 24

      G.      Termination of the Committee; Creation of Plan Oversight Committee............ 28

      H.      Liquidating Trustee as Successor in Interest to the Debtors and Committee ...... 29

      I.      Termination of the Liquidating Trust Estates ................................... 29

      J.      Objections to Administrative Expense Claims and Priority Claims................... 29

      K.      Objections to Other Claims............................................................... 30

      L.      Resolution of Disputed Other Claims and Other Claims that Have Not
              Otherwise Been Allowed .................................................................. 31

      M.      Provisions Governing Distributions................................................... 31

      N.      Procedures For Treatment Of Disputed Claims And Claims That Have
              Otherwise Not Been Allowed ........................................................... 33

      O.      Jurisdiction....................................................................................... 34

      P.      Treatment Of Executory Contracts And Unexpired Leases ............... 35

      Q.      Releases, Exculpations And Related Provisions................................ 36

      R.      Miscellaneous Provisions.................................................................. 40

IV.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
        PLAN ................................................................................................................ 43

-i-

# TABLE OF CONTENTS
(continued)

**Page**

A.      Chapter 7 Liquidation ........................................................... 43

B.      Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code ..................... 43

C.      Dismissal of the Debtors' Chapter 11 Cases................................................... 44

V.      CERTAIN FEDERAL TAX CONSEQUENCES ........................................... 44

A.      General ........................................................................................ 44

B.      U.S. Federal Income Tax Consequences to the Debtors.................................... 46

C.      U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust ...... 46

D.      U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust........................................ 47

VI.     RISK FACTORS IN CONNECTION WITH THE PLAN............................................ 48

A.      Bankruptcy Considerations................................................................... 49

B.      No Duty to Update Disclosures ................................................................ 49

C.      Representations Outside this Disclosure Statement.......................................... 50

D.      No Admission ................................................................................. 50

E.      Tax and Other Related Considerations ....................................................... 50

VII.    RECOMMENDATION AND CONCLUSION.............................................. 50

# EXHIBITS

Exhibit A –    Joint Chapter 11 Plan of Orderly Liquidation Pursuant to Section 1125 of the Bankruptcy Code

Exhibit B –    Liquidation Analysis

Exhibit C –    Schedule of the Estimated Potential Range of Recovery to Holders of Allowed Classes of Impaired Claims

## DISCLAIMER

THIS DISCLOSURE STATEMENT, THE JOINT CHAPTER 11 PLAN OF ORDERLY LIQUIDATION DATED FEBRUARY 27, 2015, ATTACHED HERETO AS <u>EXHIBIT A</u> (THE "PLAN"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (COLLECTIVELY, THE "PLAN PROPONENTS") TO KNOWN HOLDERS OF CLAIMS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED JOINTLY BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS URGE YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE PLAN PROPONENTS HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST

THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.  NO PERSON OR ENTITY SHOULD RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS DISCLOSURE STATEMENT OR THE PLAN INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES PRIOR TO THE CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL

OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS AND OTHER THIRD PARTIES SHOULD BE AWARE THAT THE PLAN CONTAINS INJUNCTIONS AND RELEASES THAT MAY MATERIALLY AFFECT THEIR RIGHTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE PLAN PROPONENTS AND THEIR PROFESSIONALS. ALTHOUGH THE PLAN PROPONENTS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE PLAN PROPONENTS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTORS' STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE PLAN PROPONENTS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE PLAN PROPONENTS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>5:00 P.M. EASTERN TIME, APRIL 6, 2015</u>, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA (THE "<u>BANKRUPTCY COURT</u>"). YOUR VOTE ON THE PLAN IS IMPORTANT.

# I.   <u>INTRODUCTION</u>

On September 3, 2013 (the "**Petition Date**"), Fairmont General Hospital, Inc. ("**Fairmont**" or "**FGH**") and Fairmont Physicians, Inc. ("**FPI**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The cases are jointly administered under bankruptcy case number 13-01054 (the "**Chapter 11 Cases**"). Since the Petition Date, Fairmont and FPI (each a "**Debtor**" and, collectively, the "**Debtors**") have remained in possession of their assets and managed their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On September 23, 2013, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors pursuant to sections 1102(a) and 1102(b)(1) of the Bankruptcy Code (the "**Committee**" and, collectively with the Debtors, the "**Plan Proponents**").

The Debtors and the Committee submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject their Joint Chapter 11 Plan of Orderly Liquidation dated February [*], 2015, a copy of which is attached hereto as <u>Exhibit A</u> (the "**Plan**").[1] The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

At a joint hearing to be held on the adequacy of this Disclosure Statement and confirmation of the Plan, the Debtors and the Committee will request that the Bankruptcy Court approve this Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of claimholders in a Class of Claims entitled to vote as set forth in the Plan to make an informed judgment about whether to accept or reject the Plan. A hearing to consider the adequacy of this Disclosure Statement and confirmation of the Plan (the "**Confirmation Hearing**") will be held on <u>April 15, 2015 at 10:00 a.m.</u>, before the Honorable Patrick M. Flatley, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of West Virginia, 324 West Main Street, Clarksburg, West Virginia 26302. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for confirmation under the Bankruptcy Code.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed and served so they are received on or before <u>April 1, 2015 at 5:00 p.m. Eastern Time</u>, in the manner described in Article III, section C of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without

---

[1] Unless otherwise defined, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition in the Plan shall control.

further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The following documents are attached as Exhibits to this Disclosure Statement:

Exhibit A:    The Plan

Exhibit B:    Liquidation Analysis

Exhibit C:    Schedule of the Estimated Potential Range of Recovery to Holders of Allowed Classes of Impaired Claims

Voting instructions are contained in Article III, section C of this Disclosure Statement, as well as on the Ballot you received in connection with this Disclosure Statement.  To be counted, your original Ballot must be actually received at the address listed above by <u>5:00 p.m., Eastern Time, on April 1, 2015</u>.

If your Ballot is not timely received, it may not be counted in determining whether the Plan has been accepted. You are urged to carefully review the contents of the Plan and Disclosure Statement, including all Exhibits attached thereto, before making your decision to vote to accept or reject the Plan.  If your Claim is "impaired" (as defined in Article III, section (B)(3) of this Disclosure Statement), you are entitled to vote to accept or reject the Plan. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they may presently exist, including, but not limited to, the provisions which provide for injunctions and releases.

This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtors' Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding (i) the Debtors' prepetition operating and financial history; (ii) the Debtors' need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Debtors' Chapter 11 Cases; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan.  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

## II.    DESCRIPTION OF THE DEBTORS' BUSINESSES AND REASONS FOR THE DEBTORS' CHAPTER 11 FILINGS

### A.    The Debtors

Fairmont is a not-for-profit 501(c)(3) corporation organized under the laws of the State of West Virginia.  Fairmont formerly operated a 207-licensed-bed acute care hospital (the "**Hospital**") located at 1325 Locust Avenue in Fairmont, West Virginia.

Fairmont has one (1) wholly-owned operating subsidiary affiliate:  FPI, doing business as Fairmont Physicians Network ("**FPN**").  FPI formerly employed the physicians in eleven (11) practices owned or controlled by the Hospital and provides clinical and office space for the practices.

As described in detail below, on July 1, 2014, after an extensive marketing effort and at the conclusion of a court-approved sale process, the Bankruptcy Court approved the sale of substantially all of the Debtors' assets to Alecto pursuant to the terms of the approved asset purchase agreement to Alecto Healthcare Services Fairmont LLC (the "**Purchaser**") for a cash payment of $15,000,000 and certain other consideration (the "**Sale**").

### B.    History of the Hospital

The origins of the Hospital date back to the early 20th century with the establishment of Cook Hospital.  In the 1930s, the Cook Hospital property was transferred to the City of Fairmont, which, thereafter, owned and operated the Hospital and controlled the Hospital's board of directors.  The oldest part of the Hospital building still in use was opened in 1939.  Subsequent additions and renovations to the Hospital building were made in 1952, 1972, 1987, 1993, and 2010.  In 1985, the Hospital was reorganized as an independent non-profit corporation and has operated as such since then.

Under Fairmont's management prior to the Sale, the Hospital provided a comprehensive range of acute, sub-acute ambulatory, emergency, and ancillary services, including cardiac catheterization, ambulatory surgical services, diagnostic imaging (including MRI, PET, and CT scanning), obstetrics, behavioral medicine, home health, and orthopedics.  Fairmont's South Marion facility (the "**HealthPlex**") houses physical, occupational, and speech therapy services, cardiac rehabilitation, limited radiology services, physician offices, and a retail wellness and fitness center.  The Hospital was accredited by both The Joint Commission and the American College of Surgeons Commission on Cancer.

Prior to the Sale, Fairmont also owned the majority of the HealthPlex facility, which is located at 51 Southland Drive in Fairmont, West Virginia.

At the time the these Chapter 11 Cases were commenced, Fairmont employed approximately 740 full and part-time employees, including approximately 30 physicians, who were employed by FPI.  There were 68 physicians with admitting privileges at the Hospital, including the physicians employed directly by the Hospital (through FPI).  Prior to the Sale, Fairmont was the fourth largest employer in Marion County, West Virginia.  During 2012, there were approximately 2,900 acute care and 1,600 behavioral health discharges from the Hospital,

and there were approximately 173,000 outpatient visits, including emergency department visits. The Debtors' annual net patient revenues for 2014 totaled approximately $83,000,000.

## C.   Hospital Bonds and Funding Mechanism

To finance the costs of the design, acquisition, construction and equipping of the HealthPlex, the County Commission of Marion County (West Virginia) issued $13,700,000 in revenue bonds in 2007 (the "**2007 Bonds**"), and the West Virginia Hospital Finance Authority issued $4,385,000 of bonds in 2008 (the "**2008 Bonds**" and, collectively with the 2007 Bonds, the "**Bonds**").  The Bonds were secured by a pledge and assignment of the Hospital's gross revenues, and the 2007 Bonds were also secured by a lien on the HealthPlex.  It was expected that the proceeds of the 2007 Bonds would be sufficient to finance to the completion of the HealthPlex.  However, due to cost overruns, the Hospital was required to obtain additional financing to complete the HealthPlex through the 2008 Bonds.

The terms and conditions of the 2007 Bonds were set forth in a Trust Indenture dated July 1, 2007 between the County Commission of Marion County and UMB Bank, N.A., as successor Bond Trustee.  The terms and conditions of the 2008 Bonds were set forth in a Trust Indenture dated February 1, 2008 between the West Virginia Hospital Finance Authority and UMB Bank, N.A., as successor Bond Trustee.

## D.   Events Leading to Chapter 11 Filings

Beginning in 2008, the Debtors began to experience recurring operating losses and cash flow concerns, attributable to various events and conditions affecting the Debtors' operations:

a.   **Reimbursement Issues**:  The Debtors were at a disadvantage with regard to reimbursement. Commercial payors (*i.e.* Blue Cross, Cigna, Humana, etc.) are not generally interested in providing their best reimbursement rates to a stand-alone, independent, medium-sized hospital such as the Debtors.  Rather, these entities negotiate from a position of significant power relative to independent hospitals such as the Debtors.

b.   **Expense Issues**:  Similar to reimbursement issues, providers of products and services are not routinely willing to offer the lowest prices to independent community hospitals in the Debtors' size range.

c.   **Labor Contracts**:  With regard to expenses, the Debtors were under considerable competitive pressure due to certain aspects of their labor contracts with two unions, Local 1199 of the Service Employees International Union ("**SEIU**") and Local 550 of the Retail, Wholesale and Department Store Union.  Although competitive with other area hospitals with respect to base salaries and wages, the Debtors' benefits packages with both unions were significantly more costly than benefits packages offered by competitor hospitals locally, regionally, and nationally.

d.   **Physician Employment**.  Salaries, wages and benefits for the physicians increased while volumes declined.

e.  **Competing Hospitals and other Health Care Service Providers**:  In October 2010, United Hospital Center ("**UHC**") completed a construction project in excess of $300 million and opened a new hospital less than ten (10) miles from the Debtors.  This event resulted in the immediate loss of Medicare Sole Community Hospital payments to the Debtors totaling approximately $3 million annually.  Shortly thereafter, UHC recruited the only urologist servicing the Debtors' service area.  This loss impacted the Debtors by approximately $3.6 million annually.  In 2011, MedExpress opened an Urgent Care Center in Fairmont, less than two (2) miles from the Debtors.  The impact of this facility was a gradual reduction of the Debtors' Emergency Department volume and revenue.  Referrals to Ruby Memorial Hospital and Mon General Hospital (both in Morgantown) continued.  Each hospital derives approximately 12% of its volume from the Debtors' service area.

f.  **HealthPlex**.  In 2006, the Debtors made an ill-conceived decision to build the HealthPlex.  At that time, prior leadership of the Debtors sought to gain a competitive advantage in the market by providing fitness, ancillary, and physician services in a more-visible campus located in the southern part of Marion County, adjacent to a major interstate highway interchange servicing Fairmont from the south.  The construction of the facility ran significantly over-budget and absorbed considerable financial capital of the Debtors.  The HealthPlex was not projected to provide any free cash-flow for five (5) years and ultimately, this decision eliminated any and all financing capacity the Debtors' would ultimately need for growth and investment going forward.  The feasibility study indicated annual membership at the HealthPlex must exceed 2,600 members to break even before capital costs.  However, annual membership never exceeded 2,100 membership during the pendency of these cases was below 2,000.  The debt service from the 2007 Bonds and 2008 Bonds also negatively affected the Debtors' cash flow.

g.  **Capital Expenditures**.  A significant factor in the  Debtors' distressed situation also was that FGH has been unable to fund the Hospital's extensive long-term capital expenditure needs.

FGH's cash position significantly deteriorated leading up to the summer of 2013 and it was apparent that the Debtors were financing their operations through the incurrence of additional vendor liabilities.  Vendor liabilities continued to increase and age out, maintenance CapEx was deferred indefinitely and there was no liquidity available for growth capital and investment.  By September 2013, the Hospital's management projected losses of almost $1 million per month.  Cash balances reached critically low levels.  Without additional capital, there were few options available to FGH.

These events and conditions affecting the Debtors' cash flow, among others, resulted in the decline in the Debtors' financial condition and led to the filing of the Bankruptcy Cases.  On the September 3, 2013 Petition Date, Fairmont and FPI filed voluntary petitions for relief under

chapter 11 of the Bankruptcy Code.  As of the Petition Date, the Debtors' financial stability was severely stressed and there was no assurance that the Hospital could continue as a going concern. This stress was compounded by the fact that no debtor-in-possession ("**DIP**") credit facility was in place to fund the bankruptcy cases, the budget presented to the Court concurrent with filing was inadequate and no potential partner had been identified

The Debtors' Chapter 11 Cases are jointly administered under bankruptcy case number 13-01054.  Since the Petition Date, Fairmont and FPI have remained in possession of their assets and managed their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**E.     Significant Events During the Bankruptcy Cases**

**1.     The Employment of Professionals**

During the course of these cases, the Court approved the employment of the following professionals:

- Spilman Thomas & Battle, PLLC—Counsel for the Debtors, retained September 12, 2013;

- Gleason & Associates, P.C.—Financial Analyst for the Debtors, retained September 12, 2013;

- Hammond Hanlon Camp, LLC—Investment Banker for the Debtors, retained September 6, 2013;

- Epiq Bankruptcy Solutions, LLC—Claims and Noticing Agent and Solicitation Agent, retained September 6, 2013;

- Sills Cummis & Gross P.C.—Counsel for the Committee, retained October 28, 2013;

- Huddleston Bolen LLP—Local counsel for the Committee, retained November 5, 2013; and

- CohnReznick LLP—Financial Advisor for the Committee, retained November 5, 2013.

**2.     Appointment of Committee**

On September 23, 2013, the Office of the United States Trustee appointed the Committee pursuant to sections 1102(a) and 1102(b)(1) of the Bankruptcy Code.

**3.     The DIP Facility**

After the Petition Date and through the efforts of Hammond Hanlon Camp, LLC and the professionals in these cases, the Debtors negotiated and obtained debtor in possession financing

in the aggregate principal amount of up to $6,000,000 from Fundamental Advisors LP, as administrative and collateral agent (the "**DIP Lender**").  On November 15, 2013, the Bankruptcy Court entered an order (the "**DIP Financing Order**") authorizing, on a final basis, the Debtors to obtain post-petition financing in the form of a loan made available to the Debtors on the terms and conditions set forth in the Debtor-In-Possession Financing Agreement in substantially the form attached to the DIP Financing Order.  The DIP Facility brought stability to the operations and a means to finance the Chapter 11 Cases.

### 4.  Cash Collateral Arrangement

In the ordinary course of their businesses, the Debtors require cash on hand and cash flow from their operations to fund their working capital, liquidity needs and other routine payables.  In addition, the Debtors require cash on hand to fund their Chapter 11 Cases and to successfully reorganize.  Accordingly, during the course of these Chapter 11 Cases, the Debtors sought and obtained approval from the Bankruptcy Court, on a final basis, to use "cash collateral" (as such term is defined in Bankruptcy Code section 363(a), "**Cash Collateral**"), under a consensual arrangement negotiated with the Bond Trustee.  On October 23, 2013, the Bankruptcy Court entered an order authorizing, on a final basis, the Debtors' use of cash collateral.

### 5.  The Debtors' Sale Process

Prior to the commencement of these Chapter 11 Cases, when it became apparent that Fairmont's long-term financial health and viability was questionable, Fairmont's board of directors began the process of seeking a strategic partner to acquire Fairmont or enter into an affiliation agreement with it.  To that end, the board hired Cain Brothers and Associates, LLC ("**Cain Brothers**"), an investment banking firm specializing in the health care industry, to locate and negotiate with potential partners and purchasers for Fairmont, beginning in late 2011.

From November 2011 through the end of 2012, Cain Brothers identified and contacted many potential strategic partners for FGH.  Several of those targets conducted due diligence, and at least five (5) of the parties contacted proceeded to more detailed discussions.  Ultimately, however, no party was willing to enter into a definitive acquisition or affiliation agreement with FGH, at which point the discussions with potential strategic partners ended and Fairmont terminated the engagement with Cain Brothers in February 2013.

Unable to find a purchaser or strategic partner, critical cash flow pressures on Fairmont forced the filing of the Chapter 11 Cases in September 2013.  Since the filings, the Debtors, with the assistance of their investment bankers, Hammond Hanlon Camp, LLC, explored additional partnership and restructuring strategies in the context of the Chapter 11 Cases.  The Debtors determined that the best way to maximize value for all creditors was through a sales process rather than through an internal restructuring.  Among other reasons, the Debtors lacked the capital to effectuate an internal reorganization and to satisfy the claims of the various creditor constituencies, including the amounts incurred through the DIP Facility.  While the DIP Facility was essential to stabilize operations, it became an obstacle to confirmation through an internal restructuring as the Debtors lacked the ability to repay such debt upon confirmation and fund a feasible plan of reorganization.  The Debtors also lacked the ability to fund essential capital

improvements necessary to maintain current operations.  As a result of these facts, the Debtors identified the Purchaser and began negotiations concerning the sale of its assets.

In furtherance of the Sale, on May 9, 2014, the Debtor's filed a motion for orders (i) approving the asset purchase agreement with the Purchaser (the "**APA**"), (ii) approving bidding procedures related to the sale of substantially all of the Debtors' assets, (iii) approving the assumption and assignment of certain related executory contracts and unexpired leases; (iv) scheduling an auction sale with respect to the Debtors' assets and a hearing date to confirm sale, (v) approving the form, manner, and sufficiency of notice thereof; (vi) authorizing the Debtors' sale of substantially all of their assets to the successful bidder and (vii) granting related relief. Under the APA, the Debtors proposed to sell substantially all of their assets to the Purchaser.  In consideration for the Debtors' assets, the Purchaser proposed to pay $15,000,000 at closing and, on or before the one year anniversary of the closing, pay or deliver additional funds in the amount of $300,000.

On May 20, the Bankruptcy Court entered an order approving bidding procedures and related matters associated with the sale process (the "**Bid Procedures Order**").  Pursuant to the Bid Procedures Order, parties wishing to participate in the sale process as prospective buyers were required to submit "Qualified Bids" (as defined in the Bid Procedures Order) by noon (prevailing Eastern time) on June 12, 2014 (the "**Bid Deadline**").  As of the Bid Deadline, no additional Qualified Bids had been received from any other parties.  Because the Purchaser was the only Qualified Bidder, the Purchaser was the Successful Bidder for the purposes of the sale and bidding process.

On July 1, 2014, the Bankruptcy Court entered an order approving the APA and authorizing the Debtors' sale of substantially all of their assets to the Purchaser.  The Sale transaction closed on or about September 19, 2014.  The DIP Facility was paid from the sale proceeds.

**6.      The Committee's Challenge to the Bond Trustee's Security Interests and the Proposed Plan Settlement**

In the course of the Chapter 11 Cases, the Debtors and the Committee have taken the position that the Bond Trustee's lien upon and security interests in Fairmont's personal property with respect to the 2007 Bonds is invalid or subject to avoidance pursuant to, *inter alia*, sections 547 and 550 of the Bankruptcy Code.  The basis for the Committee's challenge is that neither the bond counsel for the issuance of the 2007 Bonds nor the predecessor bond trustee  properly or timely perfected the security interests supporting the 2007 Bonds by filing a UCC-1 financing statement before the 90-day period "preference" prior to the Petition Date.  Although a financing statement was filed within the 90-day "preference" period prior to the Petition Date, the Committee alleges that the filing constitutes a voidable preference and is subject to avoidance under the governing provisions of the Bankruptcy Code.  The Bond Trustee has asserted that it may hold certain defenses to the Committee's challenge.

If the issues concerning the extent, validity and avoidance of the Bond Trustee's security interests were to be litigated and the Committee prevailed, the security interests in Fairmont's personal property would be deemed unenforceable and the 2007 Bond Claim would be relegated

to a General Unsecured Claim as such personal property, including, without limitation, the portion of the Sale proceeds attributable to such personal property.

In order to avoid cost, expense and uncertainty of litigation, in the months preceding the filing of the Plan and the Disclosure Statement, the Committee and the Bond Trustee engaged in good faith negotiations regarding (i) the resolution Committee's challenge to the validity and avoidability of the Bond Trustee's security interest and (ii) the treatment of the 2007 Bond Claim vis-à-vis General Unsecured Claims. Those negotiations resulted in settlement among the Committee, the Bond Trustee and the Debtors which forms the basis for the Plan. The settlement, described in detail in this Disclosure Statement (including, without limitation, in sections III.D.3 and III.F. and Article IX hereof), is embodied in the Plan and remains subject to Bankruptcy Court approval. The settlement provides for shared recoveries as between the 2007 Bond Claim and the General Unsecured Claims pursuant to a distribution waterfall described herein and set forth in the Plan. Under the proposed distribution waterfall, the Allowed 2008 Bond Claim will be satisfied in full under the Plan, the Holders of the 2007 Bonds will be entitled to receive a substantial portion of the proceeds from the Sale while certain recoveries are likewise preserved for the benefit of the Holders of General Unsecured Claims.

Also as part of the settlement, the Holders of General Unsecured Claims will be entitled to share in certain recoveries obtained by the Bond Trustee and/or the 2007 Bondholders against, *inter alia*,[2] (i) the bond counsel for the issuance of the 2007 Bonds, (ii) auditor(s) for the Debtors, (iii) the predecessor trustee and/or (iv) any officer or director of the Debtors relating to the issuance, oversight and administration of the 2007 Bonds (as defined in the Plan, the "**2007 Bond Causes of Action**"). The 2007 Bond Causes of Action include potential claims and causes of action for negligence, malpractice, breach of duty and/or breach of contract, and are expressly preserved under the Plan.

### 7.    Potential Adversary Proceedings and Post-Confirmation Causes of Action

Except as otherwise provided herein or in the Plan, the Debtors and the Committee expressly reserve, retain and preserve claims and causes of action, without limitation, including:

a.    All causes of action arising under Chapter 5 of the Bankruptcy Code and any state or federal fraudulent conveyance or voidable preference statutes;

b.    All Tort Claims (as defined in the Plan), including any and all claims against the Debtors' former auditors Arnett Foster Toothman PLLC;

c.    All D&O Claims (as defined in the Plan); and

d.    All legal and equitable defenses against any Claim or Cause of Action asserted against the Debtors.

---

[2]  This list is not exclusive and may be augmented. The failure to identify any specific party to a potential lawsuit shall not be deemed to release or otherwise any claims or causes of action against any such party and no party may rely on the failure to identify any specific party or claim herein.

     e.     All claims, demands and causes of action of any kind or nature whatsoever held by, through or on behalf of the Debtor and/or the Estate against any other Person, that have not otherwise been resolved or disposed of are preserved in full, whether or not such claims or causes of action are specifically identified in this Disclosure Statement.

Pursuant to the Plan, the Bond Trustee and the 2007 Bondholders expressly reserve, retain and preserve the 2007 Bond Causes of Action, including without limitation, any and all claims against (i) WesBanco Bank, Inc. ("**WesBanco**"), as predecessor indenture trustee under each of the 2007 Indenture and the 2008 Indenture; (ii) Steptoe & Johnson, PLLC, as counsel to WesBanco in its capacity as predecessor indenture trustee under each of the 2007 Indenture and the 2008 Indenture and (iii) the Debtors' former auditors Arnett Foster Toothman PLLC. Pursuant to the Plan, the Debtors, the Committee and any representative or assignee thereof, expressly reserve, retain and preserve the D&O Claims against some or all of the current and/or former Board of Trustees of the Debtors and any current or former officer of either of the Debtors (including, but not limited to Dan Honerbrink, Robert Marquardt and Robert Berkley)

**This Disclosure Statement constitutes notice to any party in interest of the intent to pursue any and all such causes of action to judgment and collection and the proceeds of all such causes of action are essential to the Plan.**

**8.**     **Establishment of Bar Dates**

(A)     Bar Date for Prepetition Claims.  On January 9, 2014, the Clerk of the Bankruptcy Court issued a *Notice of Bar Date for Filing Proofs of Claim* which fixed February 14, 2014 as the last day for the filing of proofs of claim in these cases for all general unsecured claims against the Debtors arising prior to the Petition Date (September 3, 2013), except claims by Governmental Units, which must have been filed by March 14, 2014 (together with the February 14, 2014 deadline, as applicable, the "**Bar Date**").

Any Claim required to be filed before the Bar Date that was not timely filed is forever barred from assertion against the Debtors, the Estate, or property thereof, and the holder of such Claim is not entitled to vote on the Plan or to participate in any distribution in these cases.

(B)     Administrative Bar Date.  On October 31, 2014, the Bankruptcy Court entered an Order (the "**Administrative Bar Date Order**") fixing December 11, 2014 as the deadline (the "**Administrative Bar Date**") by which all proofs of claim for Administrative Expense Claims and Priority Claims must have been filed, other than with respect to (A) all fees payable to the Clerk of the Bankruptcy Court or the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (B) any Administrative Expense Claim already fixed and approved by Order of the Bankruptcy Court prior to the entry of the Administrative Expense/Priority Claim Bar Date Order; (C) any Administrative Expense Claim that has been paid in full prior to the entry of the Administrative Expense Bar Date Order; (D) any Administrative Expense Claim of a governmental unit that is subject to 11 U.S.C. § 503(b)(1)(D); (E) any Professional Compensation and Reimbursement Claim; (F) fees and expenses payable to Patient Care Ombudsman and her counsel; (G) Administrative Expense Claims of Committee members for

expenses pursuant to Bankruptcy Code section 503(b)(3)(F); and (H) fees and expenses payable to the Claims Agent.

The Plan provides that any Administrative Expense Claims or Priority Claims required to be filed pursuant to the provisions of the Administrative Bar Date Order and not filed on or before the Administrative Bar Date are forever barred from assertion against the Debtors, the Estate, or property thereof, and the holder of such Administrative Expense Claim or Priority Claim is not entitled to vote on the Plan or to participate in any distribution in these cases.

Notwithstanding the fact that a Creditor may have provided goods or services to the Debtors and such Claim may be entitled to priority status or is listed on the Debtors' books and records, **the Plan expressly provides that only Creditors who filed proof of an Administrative Expense Claims or Priority Claims and such Claims become Allowed will be entitled to participate in any distribution in these Cases**.

### III.    SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.  THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE, AND CREDITORS ARE URGED TO READ THE PLAN IN FULL.

The Claims against the Debtors are divided into Classes according to their seniority and other criteria.  The Classes of Claims for each of the Debtors and the funds and other property to be distributed under the Plan are described more fully below.

### A.    Introduction

Pursuant to the Plan, the Plan Proponents propose an orderly liquidation of the Debtors' remaining Assets.  The Plan provides that all funds realized from the collection and liquidation of the Debtors' Assets will be paid to Creditors on account of their Allowed Claims in accordance with the distributive priorities of the Bankruptcy Code and the Plan.  The Plan will be implemented by establishing a Liquidating Trust that will be administered by the Liquidating Trustee.  On the Effective Date, the Debtors' Assets, except the D&O Claims and rights in and proceeds of any Insurance Policies, will be transferred to the Liquidating Trust for the benefit of Creditors.  Thereafter, the Liquidating Trustee will be responsible for liquidating the Assets and making distributions to Creditors in accordance with the terms of the Plan.

On the Effective Date, the Estate's interest in any D&O Claims and rights in and proceeds of any Insurance Policies will revest in the Debtors.  The Debtor Representative shall be authorized to institute and to prosecute through final judgment or settle the D&O Claims.  Upon the entry of a final judgment or settlement, the relevant proceeds of the D&O Claims shall be transferred to the Liquidating Trust for the benefit of the Holders of Allowed Claims, in accordance with the provisions of the Plan.  The distributions to Creditors may be significantly enhanced by the pursuit of the 2007 Bond Causes of Action and the D&O Claims and the

proponents of the Plan are relying on those Claims (and the underlying D&O Policies) to increase the dividend to Creditors herein.

In short, the Allowed 2008 Bond Claim, which includes both the outstanding principal due and accrued interest owing as of the Petition Date, will be satisfied in full under the Plan. The Allowed 2007 Bond Claim is projected to receive initial distributions up to $4,250,000 (*i.e.*, $3,500,000 of the Estimated Liquidated Assets and up to $750,000 on its 50% share of the Additional Sources of Cash), then the remaining Assets will be allocated 60% to General Unsecured Creditors and 40% to Holders of the 2007 Bonds. Holders of General Unsecured Claims will receive the remainder of the Estimated Liquidated Assets (approximately $790,000) and 50% of the Additional Sources of Cash (estimated to be approximately $650,000). To the extent that these amounts are available on the Effective Date, the Liquidating Trustee will fund $500,000 in a Distribution Account for the benefit of Holders of General Unsecured Claims and the remainder will be held as a reserve by the Liquidating Trustee. Thereafter, the Liquidating Trustee will review and analyze all General Unsecured Claims in an effort to distribute 10% of the Allowed General Unsecured Claims to Holders of Allowed General Unsecured Claims. After the 10% threshold is achieved, the remaining Assets (and proceeds of Causes of Action) will be shared with the Holders of the 2007 Bonds – 60% to Holders of General Unsecured Claims and 40% to Holders of the 2007 Bonds. Holders of General Unsecured Claims against FPI will receive any net proceeds of any FPI Causes of Action.

**B.      Voting Procedures and Confirmation Requirements**

**1.      Ballots and Voting Deadlines**

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan. The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be filed with the Solicitation Agent, Epiq Bankruptcy Solutions, LLC ("**Epiq**"), by no later than 5:00 p.m. Eastern Time on April 1, 2015 (the "**Voting Deadline**"). Ballots not actually received by the Voting Deadline may not be counted, and Ballots that do not indicate either an acceptance or rejection of the Plan will be deemed to constitute an acceptance of the Plan. If you have any questions regarding the procedure for voting, please contact:

Fairmont General Hospital Inc. Plan Solicitation
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, New York 10017
Phone: (646) 282-2500

It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

**2.     Parties in Interest Entitled to Vote**

Any Holder of a Claim against the Debtors whose Claim has not been Disallowed previously by the Bankruptcy Court is entitled to vote to accept or reject the Plan if such Claim belongs to an "impaired" Class (see Subsection 3 below) under the Plan and either (a) has been scheduled by the Debtors and is not scheduled as disputed, contingent or unliquidated, or (b) such Holder has filed a proof of Claim before the Bar Date.  In addition, any Claim to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder of the Claim, temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**3.     Definition of Impairment**

Pursuant to section 1124 of the Bankruptcy Code, a class of claims is impaired under a plan unless, with respect to each claim of such class, the plan:

1.      leaves unaltered the legal, equitable, and contractual rights of the holder of the claim or equity interest; or

2.      notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

(A)     cures any such default that occurred before or after the commencement of the cases under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

(B)     reinstates the maturity of such claim or interest as it existed before such default;

(C)     compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

(D)     if such claim or such interests arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the Holder of such claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such Holder as a result of such failure; and

(E)     does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the Holder of such claim or interest.

The following Classes are impaired under the Plan and entitled to vote:

- Class 2 (Allowed 2008 Bond Claim)
- Class 3 (Allowed 2007 Bond Claim)
- Class 5 (FGH General Unsecured Claims)
- Class 6 (FPI General Unsecured Claims)

**C.     Confirmation Procedure**

**1.     Confirmation Hearing**

A hearing before the Honorable Patrick M. Flatley, United States Bankruptcy Judge, has been scheduled for <u>April 15, 2015 at 10:00 a.m. Eastern Time</u>, at the United States Bankruptcy Court for the Northern District of West Virginia, 324 West Main Street, Clarksburg, West Virginia 26302 to consider confirmation of the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

**2.     Procedure for Objections**

Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on counsel for the Debtors and the Committee and all parties who have filed a notice of appearance by <u>5:00 p.m. Eastern Time on April 1, 2015</u>.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

**3.     Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of section 1129 of the Bankruptcy Code.  Among the requirements for confirmation are that the Plan be: (a) accepted by all impaired classes of Claims that are entitled to vote or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; (b) feasible; and (c) in the "best interests" of Creditors impaired under the Plan that have not voted to accept the Plan.  The Bankruptcy Court also must find that:

- the Plan has classified Claims in a permissible manner;

- the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

**4.     Voting and Acceptance of the Plan**

As a condition to confirmation of the Plan, the Bankruptcy Code requires each Class of "impaired" Claims entitled to vote on the Plan to vote to accept the Plan. The Bankruptcy Code

defines acceptance of a plan by a class of creditors as acceptance by holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) number of those claims in that class actually voting. Holders of Claims who fail to vote will not be counted as either accepting or rejecting the Plan. A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of Claims that are not "impaired" under the Plan are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote. Classes of Claims that receive no distribution under the Plan are conclusively presumed to have rejected the Plan and are not entitled to vote.

### 5.    Best Interests Test

The "best interests" of impaired creditors test requires that each Holder of a Claim that has not voted to accept the Plan and belongs to an impaired Class receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what members of each impaired Class of Claims would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtors' assets would generate in the context of a chapter 7 liquidation. The amount available for satisfaction of Claims would consist of the proceeds resulting from the liquidation, reduced by the Claims of secured creditors to the extent of the value of their collateral, and the costs and expenses of the liquidation.

Because the Plan is a plan of orderly liquidation, each Class of Creditors will receive substantially the same treatment it would receive if the Debtors' Assets were liquidated pursuant to chapter 7 of the Bankruptcy Code, except that the Estate will neither be taxed with the additional expenses and commissions of a chapter 7 trustee nor delayed by such a trustee's appointment and need to become familiar with these complex cases. Attached as Exhibit B is a liquidation analysis prepared by the Committee's financial analyst reflecting a greater distribution to Creditors pursuant to the Plan than Creditors would receive in a hypothetical chapter 7 liquidation. Accordingly, the Plan Proponents believe the Plan satisfies the "best interests" of impaired creditors test.

### 6.    The Feasibility Test

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtors. Substantially all of the Debtors' Assets have been sold, and the Plan provides for the orderly liquidation of the Debtors' Assets. Thus, confirmation of the Plan will not be followed by a liquidation (other than the orderly liquidation provided for in the Plan) or further reorganization.

### 7.    The Fair and Equitable Test

If any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance under the "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. To obtain a confirmation under those circumstances, the Debtors and the Committee must show, among other things, that the Plan "does not

discriminate unfairly" against and is "fair and equitable" with respect to each impaired Class of Claims that has rejected the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interest, that the holder of any claim or equity interest that is junior to the claims or equity interest of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.

THE PLAN PROPONENTS WILL SEEK CONFIRMATION OF THE PLAN UNDER THE "CRAM DOWN" PROVISIONS OF SECTION 1129(b) IF LESS THAN THE REQUISITE AMOUNT OR NUMBER OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.

### 8. Other Requirements of Section 1129

The Debtors and the Committee believe that the Plan meets all the other technical requirements of section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

### D. Classification of Claims and Interests and Their Treatment Under the Plan

### 1. Classification of Claims

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim in a particular Class only if such Claim is substantially similar to the other Claims in that Class. The Debtors and the Committee believe the Plan's classifications place substantially similar Claims in the same Class and thus meet the requirements of section 1122 of the Bankruptcy Code.

The Plan classifies Claims into six (6) Classes: Class 1 Priority Non-Tax Claims; Class 2 Allowed 2008 Bond Claim; Class 3 Allowed 2007 Bond Claim; Class 4 Allowed Secured Claims of Other Lienholders; Class 5 FGH General Unsecured Claims; and Class 6 FPI General Unsecured Claims. For each Class, the Plan states whether the Claims are impaired and how the Holders of the Claims will be treated under the Plan. The Classes and proposed treatment of Allowed Claims of each Class under the Plan are summarized and described below. After Confirmation, and upon the occurrence of the Effective Date, the Plan binds the Debtors and all Creditors, whether or not those Creditors have accepted the Plan.

### 2. Unclassified Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Claims of a kind specified in sections 507(a)(2) or (8) of the Bankruptcy Code are not to be designated in a class. Thus,

Administrative Expense Claims and Priority Tax Claims against the Debtor, as well as statutory fees under 28 U.S.C. § 1930, are treated separately under the Plan as unclassified Claims.

### a. Administrative Expense Claims

Administrative expenses are Claims for fees, costs or expenses of administering the Debtors' Chapter 11 Cases that are allowed under section 503(b) of the Bankruptcy Code, including all professional compensation requests pursuant to sections 330 and 331 of the Bankruptcy Code. As of the Administrative Bar Date, the filed Administrative Expense Claims are estimated to be approximately $1,300,000 for Claims against FGH, exclusive of Professional Compensation and Reimbursement Claims, which amount is based upon proofs of claim that have been filed with the Claims Agent.[3] There are no projected Administrative Expense Claims of FPI to be paid.

### i. General.
The Plan provides that, subject to the allowance procedures and the deadlines provided in the Plan, except to the extent any entity entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim, on or before the later of the date that is ten (10) Business Days after (i) the Effective Date and (ii) the date of entry of a Final Order determining and allowing such Claim as an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.

### ii. Employee Benefits.
The Plan provides that all Employee Benefit Claims that have not been paid as of the Effective Date, and for which no proof of Claim has been filed, shall be Disallowed and expunged as of the Effective Date. Not later than the Effective Date, any and all of the Debtors' obligations relating to employee benefits (including any self-funding obligations) shall be terminated and of no further force or effect, other than the obligation to satisfy any Allowed Employee Benefit Claims under the Plan.

### iii. Professional Compensation and Reimbursement Claims.
The Plan provides that all Professionals seeking payment of Professional Compensation and Reimbursement Claims shall file their respective final Fee Applications no later than sixty (60) days after the Effective Date. All Professional Compensation and Reimbursement Claims shall be treated as Administrative Expense Claims as set forth in section 4(A)(1)(a) above, or shall be paid on such other terms as may be mutually agreed upon between the Holder of an Allowed Professional Compensation and Reimbursement Claim and the Debtor, or the Liquidating Trustee, as the case may be. Failure to timely file a final Fee Application shall result in the Professional Fee Compensation and Reimbursement Claim being forever barred and discharged.

---

[3] The estimated claim totals in this section III(D) are provided by the Debtors based on the Claims Agent's initial review of the filed proofs of claim, except that the estimated amounts for the Professional Compensation and Reimbursement Claims were provided by the respective professionals. Neither the Committee nor its professionals has had the opportunity to verify the estimates as of the filing of this Disclosure Statement.

      **iv.**     **Priority Tax Claims.**  The Plan provides that, in full satisfaction of an Allowed Priority Tax Claim, except to the extent any entity entitled to payment of any Allowed Priority Tax Claim has received payment on account of such Claim prior to the Effective Date, each Holder of such Allowed Priority Tax Claim, if any, shall receive Cash equal to the amount of such Claim on or before the later of the date that is ten (10) Business Days after (i) the Effective Date and (ii) entry of a Final Order allowing such Priority Tax Claim, or as soon thereafter as is practicable, unless such Holder shall have agreed to different treatment of such Allowed Claim.

      **v.**     **Statutory Fees.**  The Plan provides that, on or before the date that is thirty (30) days after the Effective Date, the Liquidating Trustee shall make all payments required to be paid to the U.S. Trustee pursuant to section 1930 of Title 28 of the United States Code.  All fees payable pursuant to section 1930 of Title 28 of the United States Code after the Effective Date shall be paid by the Liquidating Trustee on a quarterly basis until the Chapter 11 Cases are closed, converted, or dismissed.

    **3.**     **Classified Claims**

      The following describes the Plan's classification of those Claims against the Debtors required to be classified under the Bankruptcy Code:

      **a.**     **Class 1** consists of Priority Non-Tax Claims of the Debtors.  To the extent there are any Priority Non-Tax Claims, in full and final satisfaction, settlement, release, and discharge of each Priority Non-Tax Claims, each Holder of an Allowed Class 1 Claim, if any, will receive Cash equal to such Allowed Class 1 Claim, without interest, on or before the later of the date that is thirty (30) Business Days after (i) the Effective Date and (ii) entry of a Final Order allowing such Claim, or as soon thereafter as is practicable.  Any Priority Non-Tax Claim, proof of which was required to be filed on or before the Bar Date but was not timely filed, is and shall be Disallowed and expunged, effective on the Effective Date.  The Priority Non-Tax Claims are not Impaired.  Holders of Allowed Class 1 Priority Non-Tax Claims, therefore, are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  Objection procedures with respect to Allowed Class 1 Claims are set forth in section VII.P of the Plan.

      **b.**     **Class 2** consists of the Allowed 2008 Bond Claim.  As of the Effective Date, the Allowed 2008 Bond Claim shall be deemed Allowed for all purposes under the Plan in the amount of $2,742,618 less the aggregate amount of Trustee-Held Funds held by the Bond Trustee in respect of the 2008 Bonds.  Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Allowed 2008 Bond Claim, on or before the date that is ten (10) Business Days after the Effective Date, the Liquidating Trustee shall transfer to the Bond Trustee, for the benefit of the Holders of the 2008 Bonds, Cash in an amount equal to (x) $2,742,618 *minus* (y) the aggregate amount of Trustee-Held Funds held by the Bond Trustee in respect of the 2008 Bonds, which Cash shall be administered, applied and distributed in accordance with the 2008 Bond Documents.  Class 2 is Impaired and, therefore, the Holders of Allowed Class 2 Claims are entitled to vote to accept or reject the Plan.

c.    **Class 3** consists of the Allowed 2007 Bond Claim.  The Allowed 2007 Bond Claim shall be deemed Allowed for all purposes under the Plan in the amount of $12,193,827 less the aggregate amount of Trustee-Held Funds held by the Bond Trustee in respect of the 2007 Bonds.  All 2007 Bond Distributions detailed in section IV.B.3 of the Plan shall be administered, applied and distributed in accordance with the 2007 Bond Documents. Upon the terms and subject to the conditions set forth in the Plan, in full and final satisfaction, settlement, release, and discharge of the Allowed 2007 Bond Claim, the Deficiency Claim and in partial consideration for the agreement to transfer certain proceeds of the 2007 Bond Causes of Action to the Liquidating Trust, the Allowed 2007 Bond Claim shall receive the following treatment:

### i.    Initial Distribution

On or before the date that is ten (10) Business Days after the Effective Date, the Liquidating Trustee shall transfer to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds, Cash in the amount equal to (i) $3,500,000, if the Estimated Liquidated Assets equals or exceeds $4,000,000, or (ii) 85% of the Liquidating Trust Distributable Cash, if the Estimated Liquidated Assets is less than $4,000,000 (the "**Initial Class 3 Distribution**").

### ii.    Supplemental Distributions

After the Initial Distribution is made, from time-to-time after the Effective Date, as soon and as often as is reasonably practicable from the liquidation of the Additional Sources of Cash, the Liquidating Trustee shall transfer to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds, Cash in an amount equal to (i) 85% of such Additional Sources of Cash until the aggregate amount of Distributions to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds (including the Initial Class 3 Distribution), equals $3,500,000, and thereafter (ii) 50% of such Additional Sources of Cash until the aggregate amount of Distributions to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds equals $4,250,000 (each of the foregoing, a "**Supplemental Class 3 Distribution**").

To the extent that the aggregate amount of Distributions to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds (i.e., the sum of the Initial Class 3 Distribution and the Supplemental Class 3 Distributions) reaches $4,250,000, all Assets, including any Cash from the Estimated Liquidated Assets and the Additional Sources of Cash in excess of $4,250,000 shall be used to satisfy the Allowed Class 5 General Unsecured Claims consistent with the terms of the Plan, subject to section c below.  For the avoidance of doubt, the Bond Trustee shall receive no further Distributions under the Plan unless and until Holders of Allowed Class 5 General Unsecured Claims receive Distributions equal to 10% of all such Allowed Class 5 General Unsecured Claims in accordance with section IV.B.5.b of the Plan.

### iii.    Final Distributions

If and when, after (i) all required Supplemental Class 3 Distributions have been made to Class 3 and (ii) Distributions have been made to the Holders of Allowed General Unsecured Claims in an aggregate amount equal to or greater than 10% of such Allowed General Unsecured Claims, then from time-to-time after the Effective Date and as soon and as often as is reasonably

practicable, the Liquidating Trustee shall transfer to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds, Cash from the liquidation of the Additional Sources of Cash in an amount equal to 40% of such Cash until the Allowed 2007 Bond Claim is fully satisfied (each such distribution, a "Final Class 3 Distribution" and, together with the Initial Class 3 Distribution and all Supplemental Class 3 Distributions, the "**2007 Bond Distributions**").

### iv.    Proceeds of the 2007 Bond Causes of Action

The Bond Trustee and/or the majority Holder of the 2007 Bonds will pursue, prosecute and/or litigate the 2007 Bond Causes of Action in each of their respective discretions.  The expenses associated with the prosecution of the 2007 Bond Causes of Action shall constitute Post-Effective Date Expenses and shall be paid or reimbursed by the Liquidating Trustee from the assets of the Liquidating Trust to the extent available.

In partial consideration for the Initial Class 3 Distribution, the Supplemental Class 3 Distributions and the Final Class 3 Distributions provided to the Holders of 2007 Bonds pursuant to the Plan, and in partial settlement and compromise of the Committee Challenge Claims hereunder, on or after the Effective Date, upon the entry of a final judgment or settlement of any of the 2007 Bond Causes of Action, the Bond Trustee or the majority Holder of the 2007 Bonds shall transfer one hundred percent (100%) of the net proceeds of such judgment and/or settlement to the Liquidating Trust for Distribution in accordance with sections IV.B.3.a-c and IV.B.5.

Class 3 is Impaired and, therefore, the Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

**d.**    **Class 4** consists of the Secured Claims of Other Lienholders.  In the sole discretion of the Plan Proponents, the Holder of an Allowed Class 4 Secured Claim shall be treated in one of the following ways:

**i.**    on the Effective Date, the legal, equitable, and contractual rights of each Holder of an Allowed Secured Claim shall be reinstated in accordance with the provisions of section 1124(2) of the Bankruptcy Code notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Secured Claim to demand or receive payment of such Allowed Secured Claim before the stated maturity of such Allowed Secured Claim from and after the occurrence of a default; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date;

**ii.**    on the Effective Date, the Holder of an Allowed Secured Claim shall (i) retain a Lien securing such Allowed Secured Claim and (ii) receive deferred Cash

payments from the Liquidating Trust totaling at least the value of such Allowed Secured Claim as of the Effective Date;

        **iii.**     on the Effective Date, the collateral securing such Allowed Secured Claim shall be surrendered to the Holder of such Allowed Secured Claim in full satisfaction of such Allowed Secured Claim; or

        **iv.**     the Holder of an Allowed Secured Claim shall be paid, in Cash, an amount equal to such Holder's Allowed Secured Claim, on or before the later of the date that is ten (10) Business Days after (i) the Effective Date and (ii) entry of a Final Order allowing such Claim as a Secured Claim, or as soon thereafter as is practicable.  To the extent the collateral securing an Allowed Secured Claim has been or is to be sold pursuant to an Order of the Bankruptcy Court, the amount to be paid to the Holder of such Allowed Secured Claim pursuant to the preceding sentence shall be net of the costs of sale of such collateral and otherwise subject to the rights of the Debtors or the Liquidating Trustee pursuant to section 506(c) of the Bankruptcy Code.

The failure to object to any Secured Claim in the Chapter 11 Case shall be without prejudice to rights of the Debtors or the Liquidating Trustee to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Secured Claim.

Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of the Debtors held with respect to a Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Claim until such Allowed Claim is satisfied, at which time such Lien shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; provided, however, that the Debtors or Liquidating Trustee, as the case may be, may condition delivery of any final payment upon receipt of an executed release of the Lien.  Any and all Liens securing any Secured Claim that is not an Allowed Claim shall be released, shall be deemed null and void, and shall be unenforceable for all purposes.  Nothing in the Plan shall preclude the Debtors or the Liquidating Trustee from challenging the validity of any alleged Lien on any asset of the Debtors or the value of the property that secures any alleged Lien.

Class 4 is not Impaired and, therefore, Holders of Class 4 Secured Claims are not entitled to vote to accept or reject the Plan.  Each Holder of a Class 4 Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Class 4 shall not affect any General Unsecured Claim for any Allowed Deficiency Claim of the Holder. No Lien with respect to any Secured Claim shall attach to any property sold free and clear pursuant to the APA.

        **e.**     **Class 5** consists of all FGH General Unsecured Claims, including Claims against FGH for damages arising from the rejection of an unexpired lease or executory contract and deficiency claims of any Secured Creditors.  The Plan provides for the following treatment of Allowed General Unsecured Claims:

i. **Initial Funding of Liquidating Trust; Distribution Reserve Account**

The Liquidating Trust shall be initially funded through the payment of the Estimated Liquidated Assets Remainder and all other Assets of the Debtors.

The Liquidating Trustee shall establish a distribution reserve account (the "**Distribution Reserve Account**") for the purposes of making Distributions to Holders of an Allowed Class 5 General Unsecured Claims. The Liquidating Trustee shall have sole discretion to determine the amount to be funded into the Distribution Reserve Account provided that such discretion is not exercised in a manner that is inconsistent with the express provisions of the Plan, including, without limitation, section IV.B.3 thereof. Upon the Effective Date, to the extent that any amounts from the Estimated Liquidated Assets and the Additional Sources of Cash exceeds $5,000,000, the Liquidating Trustee shall fund the Distribution Reserve Account in an amount of not less than $500,000.

ii. **Distributions to Allowed General Unsecured Claims**

After the Initial Class 3 Distribution is made and consistent with the treatment of Class 3 Allowed 2007 Claim in section IV.B.3 of the Plan, from time-to-time after the Effective Date, and as soon and as often as is reasonably practicable, the Liquidating Trustee shall, in his discretion, deposit Cash into the Distribution Reserve Account for Distributions to Holders of Class 5 Allowed General Unsecured Claims. The amounts funded to the Distribution Reserve Account shall be net of amounts necessary to satisfy Claims under the Plan and net of reasonable and appropriate reserves for the administration of the Liquidating Trust and expenses of the Debtor Representative.

Thereafter (*i.e.*, after aggregate Distributions have been made to the Bond Trustee, for the benefit of the Holders of the 2007 Bonds consistent with section IV.B.3.b of the Plan), the Liquidating Trustee shall, subject to his discretion to create and maintain appropriate reserves, deposit any additional Cash proceeds into the Distribution Reserve Account for the satisfaction of Class 5 Allowed General Unsecured Claims until the amount deposited in such reserve reaches an amount equal to 10% of such Allowed General Unsecured Claims.

Consistent with section IV.B.3.c of the Plan, if and when, after (i) all required Supplemental Class 3 Distributions have been made to Class 3 and (ii) Distributions have been made to the Holders of Allowed General Unsecured Claims in an aggregate amount equal to 10% of such Allowed General Unsecured Claims, then from time-to-time after the Effective Date, and as soon and as often as is reasonably practicable, the Liquidating Trustee shall deposit Cash proceeds from Additional Sources of Cash into the Distribution Reserve Account in an amount equal to 60% of such Cash until all Allowed General Unsecured Claims are fully satisfied.

iii. **Payments from the Liquidating Trust**

Each Holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of its Allowed Class 5 Claim, a Pro Rata share of the monies to be distributed on account of Allowed Class 5 Claims by the Liquidating Trust (subject to establishment of an appropriate reserve

-22-

pending final determination and payment of Allowed Administrative Claims and Allowed Priority Claims) from the Distribution Reserve Account pursuant to the Plan.

Payments to each Holder of an Allowed Class 5 Claim shall be made on the Distribution Dates, and in accordance with the Plan. Any Class 5 Claim, proof of which was required to be filed by the Bar Date and was not timely filed, is and shall be Disallowed and expunged, effective on the Effective Date. The failure to object to any Class 5 General Unsecured Claim in the Chapter 11 Cases shall be without prejudice to rights of the Debtors or the Liquidating Trustee to contest or object to such Claim.

Class 5 is Impaired and, therefore, the Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

      **f.**    **Class 6** consists of all FPI General Unsecured Claims, including Claims against FPI for damages arising from the rejection of an unexpired lease or executory contract and deficiency claims of any Secured Creditors. Distributions to Holders of FPI Allowed Claims shall be made solely from the net proceeds (if any) of any Causes of Action of FPI in accordance with priorities set forth in the Bankruptcy Code. Payments to each Holder of an Allowed Class 6 Claim shall be made on the Distribution Dates, and in accordance with the Plan. Any Class 6 Claim, proof of which was required to be filed by the Bar Date and was not timely filed, is and shall be Disallowed and expunged, effective on the Effective Date. The failure to object to any Class 6 Claim in the Chapter 11 Cases shall be without prejudice to rights of the Debtors or the Liquidating Trustee to contest or object to such Claim. Class 6 is Impaired and, therefore, the Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

**E.**    **Estimated Range of Potential Recoveries for Impaired Classes of Claims**

A schedule of the estimated potential range of recovery to holders of Allowed Classes of Impaired Claims is attached hereto as Exhibit C. The range of recoveries set forth in Exhibit C is not a guaranty of actual results, but is an estimate based on the currently available information and assumptions that are subject to material change. The actual distributions to holders of Allowed Classes of Impaired Claims will necessarily be affected by a variety of contingencies that cannot be determined with certainty at this time, including, without limitation, the ultimate amount of funds that will be available for distribution with respect to the Allowed Claims after payment in full of Unclassified Claims, Claims senior in priority to each such Class, the aggregate amount of Allowed Claims in each such Class, the results of the claim objection and reconciliation process, and the results of prosecution of the Chapter 5 Actions and other Causes of Action, which Causes of Action may have a material effect on funding a distribution to holders of Allowed Classes of Impaired Claims.

Based on an initial review of the Claims filed in the Cases, it is expected that the total Allowed General Unsecured Claims will be between $15,000,000 and $25,000,000 (exclusive of the Claims of the 2007 Bonds and prior to a reconciliation of the Claims). The Plan Proponents further project that at least $500,000 will be available to satisfy the Allowed Claims for Class 5 FGH General Unsecured Claims and additional amounts will be available for Distribution from the Additional Sources of Cash and the proceeds of the Causes of Action and the 2007 Bond Causes of Action. The actual amount Distributed to Holders of Class 5 General Unsecured

Claims (and the timing any such Distributions) will vary based on the Assets recovered and the reconciled amount of General Unsecured Claims which are Allowed.

## F.    Means for Execution of the Plan

### 1.    Overview

The Plan provides for the disposition of substantially all of the Assets and the distribution of the net proceeds thereof to Holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code.  The Plan also creates a mechanism for the Liquidating Trustee and Debtor Representative to pursue Claims and Causes of Action, including the D&O Claims, to enable recoveries to Creditors.

### 2.    No Substantive Consolidation

Nothing contained in the Plan shall be deemed to consolidate the Estates of FGH and FPI. As set forth herein, any reference to "Debtor", "Allowed Claims" and/or "Distributions" in section IV of the Plan (except section IV.B.6 thereof) shall be solely with respect to FGH and FGH's creditors and shall not apply to FPI or FPI's creditors.

### 3.    Calculation of Estimated Liquidated Assets

Prior to the Effective Date, the Debtors, the Committee, the Bond Trustee and their respective professionals shall undertake in good faith to jointly calculate the amount of Estimated Liquidated Assets available to the Liquidating Trust.  To the extent that the parties cannot reach agreement on the calculation, any of them may seek a judicial determination or estimation of Estimated Liquidated Assets for purposes of effecting Distributions under the Plan.

### 4.    Establishment of Liquidating Trust; Appointment of Liquidating Trustee and Debtor Representative; Revesting of D&O Claims in Estates; Assigned Claims

Prior to the Effective Date, the Debtors shall execute the Liquidating Trust Agreement. The Liquidating Trust Agreement is hereby incorporated into the Plan in its entirety as if set forth in full.  The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust.

On the Effective Date, and in accordance with the Confirmation Order, the Estates' title to all of the Assets, (other than the D&O Claims which shall revest in the Debtors and shall be pursued by the Debtor Representative), shall automatically pass to the Liquidating Trust, free and clear of all Claims and equity interests in accordance with section 1141 of the Bankruptcy Code.  Notwithstanding the foregoing, the Plan Proponents reserve the right to modify the Plan to exclude certain Assets from transfer to the Liquidating Trust. The Confirmation Order shall constitute a determination that the transfers of the Assets to the Liquidating Trust are legal and valid and consistent with the laws of the State of West Virginia.

All parties shall execute any documents or other instruments as necessary to cause title to the Assets to be transferred to the Liquidating Trust.  The Assets will be held in trust for the

benefit of all Holders of Allowed Claims pursuant to the terms of the Plan and the Liquidating Trust Agreement.

The Liquidating Trustee will be appointed as of the date of execution of the Liquidating Trust Agreement. The Liquidating Trustee will pay or otherwise make distributions on account of all Allowed Claims against the Debtors in accordance with the terms of the Plan.

On the Effective Date, a Debtor Representative shall be appointed pursuant to section 1123(b)(3) of the Bankruptcy Code.

On the Effective Date, the Estates' interest in any D&O Claims and Tort Claims and rights in and proceeds of any Insurance Policies necessary for the prosecution of all such Claims will revest in the Debtor. The Debtor Representative shall be authorized to institute and to prosecute through final judgment or settle the D&O Claims and Tort Claims. Upon the entry of a final judgment or settlement, the relevant proceeds of the D&O Claims shall be transferred to the Liquidating Trust for the benefit of the Holders of Allowed Claims, in accordance with the provisions of the Plan.

**The Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Liquidating Trustee and the Debtor Representative on the Assets, D&O Claims and rights in and proceeds of any Insurance Policies. The Proceeds of All Causes of Action and any Proceeds to be Received from the 2007 Bond Causes of Action are Material to the Implementation of the Plan and the Recoveries to Creditors Herein.**

5.    **Income Tax Status**

For federal income tax purposes, all parties (including, without limitation, the Debtor, the Liquidating Trustee, and the Beneficiaries of the Liquidating Trust Estates) shall treat the Liquidating Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124. For federal income tax purposes, the transfer of Assets to the Liquidating Trust under the Plan shall be treated as a deemed transfer to the Beneficiaries of the Liquidating Trust Estates in satisfaction of their Claims followed by a deemed transfer of the Assets by the Beneficiaries to the Liquidating Trust. For federal income tax purposes, the Beneficiaries will be deemed to be the grantors and owners of the Liquidating Trust and its assets. For federal income tax purposes, the Liquidating Trust will be taxed as a grantor trust within the meaning of IRC sections 671-677 (a non-taxable pass-through tax entity) owned by the Beneficiaries. The Liquidating Trust will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay tax on, the Liquidating Trust's tax items of income, gain, loss deductions and credits ("**Tax Items**"). The Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the assets transferred to the Liquidating Trust for all federal income tax purposes. The assets shall be valued based on the Liquidating Trustee's good faith determination of their fair market value.

6.      **Powers and Authority of the Liquidating Trustee**

The powers of the Liquidating Trustee are set forth in full in the Liquidating Trust Agreement and shall include, among other things: (a) the power to sell, lease, license, abandon or otherwise dispose of all remaining assets of the Liquidating Trust Estates subject to the terms of the Plan; (b) the power to effect distributions under the Plan to the Holders of Allowed Claims; (c) the authority to pay all costs and expenses of administering the Liquidating Trust Estates after the Effective Date, including the power to employ and compensate Persons to assist the Liquidating Trustee in carrying out the duties hereunder, and to obtain and pay premiums for insurance and any other powers necessary or incidental thereto; (d) the power to implement the Plan including any other powers necessary or incidental thereto; (e) the authority to settle Claims, Chapter 5 Actions, or disputes as to amounts owing to the Estates; (f) the authority to participate in any post-Effective Date motions to amend or modify the Plan or the Liquidating Trust Agreement, or appeals from the Confirmation Order; (g) the authority to participate in actions to enforce or interpret the Plan; and (h) the power to bind the Liquidating Trust. Each of the foregoing powers may be exercised by the Liquidating Trustee without further order of the Bankruptcy Court. Notwithstanding any of the foregoing, the Liquidating Trustee may not materially amend or alter the terms and provisions of the Plan.

The authority of the Liquidating Trustee will commence as of the Effective Date of the Plan and will remain and continue in full force and effect until all of the Assets are liquidated in accordance with the Plan, the funds in the Liquidating Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities and the Order closing the Chapter 11 Cases is a Final Order.

7.      **Funding of the Liquidating Trust**

The funding of the Liquidating Trust for the payments to be made to Holders of Allowed Claims under the Plan and the payment of Post-Effective Date Expenses will be from (i) the Liquidating Trust Expense Reserve, (ii) the Debtors' Cash on hand as of the Effective Date, which will be transferred to the Liquidating Trust as of the Effective Date and proceeds from the investment of such Cash, and (iii) the proceeds of the liquidation of the Assets, including, without limitation, any Claims or Causes of Action or the proceeds of the 2007 Bond Causes of Action.

8.      **Liquidating Trust's Post-Effective Date Expenses**

All expenses related to implementation of the Plan incurred from and after the Effective Date through the date on which the Liquidating Trust is dissolved will be expenses of the Liquidating Trust, and the Liquidating Trustee will disburse funds from the Liquidating Trust Expense Reserve, as appropriate, for purposes of paying the Post-Effective Date Expenses of the Liquidating Trust without the need for any further Order of the Court. The Post-Effective Date Expenses shall include, but are not limited to, the fees and expenses of the Liquidating Trustee, the fees and expenses of the Debtor Representative, the fees and expenses of the professionals employed by the Liquidating Trustee and/or the Debtor Representative, and other costs, expenses

and obligations of the Liquidating Trust until the date the Liquidating Trust is terminated in accordance with section VII.N and the Liquidating Trust Agreement.

Prior to making a distribution to any Holders of Allowed Claims under the Plan, the Liquidating Trustee may place in reserve any funds that may be needed to pay Disputed Claims and Claims that have otherwise not been Allowed in the event that all or a portion of such Claims become Allowed Claims. When a Claim is Allowed or Disallowed (and thus becomes an Allowed Claim or a Disallowed Claim, in whole or in part), the funds set aside on account of such Claim shall be released from the respective account and shall be available for distribution in accordance with the terms of the Plan to either (i) the Holder of the Claim that has become an Allowed Claim, or (ii) if Disallowed, the Holders of Allowed Claims. Consistent with the terms of the Plan, the Liquidating Trustee, in its sole discretion, on and after the Effective Date, shall have authority to increase or decrease the Distribution Reserve Account, as reasonably necessary and appropriate, and upon satisfaction of all Allowed Claims required to be paid from the Distribution Reserve Account, to transfer amounts held therein for distribution pursuant to the Plan.

### 9.    Treatment of 2007 Bond Causes of Action

Nothing in the Plan shall be deemed to effect a release or waiver of any 2007 Bond Cause of Action, all of which 2007 Bond Causes of Action are expressly reserved by the 2007 Bondholders and/or the Bond Trustee. The Bond Trustee or the majority Holder of the 2007 Bonds will pursue, prosecute and/or litigate the 2007 Bond Causes of Action in its discretion. The expenses associated with the prosecution of the 2007 Bond Claims shall constitute Post-Effective Date Expenses and shall be paid or reimbursed by the Liquidating Trust. All such expenses associated with the prosecution of the 2007 Bond Claims shall be agreed upon in advance by the Liquidating Trustee.

In partial consideration for the Initial Class 3 Distribution, the Supplemental Class 3 Distributions and the Final Class 3 Distributions provided to the Holders of 2007 Bonds pursuant to the Plan, and in partial settlement and compromise of the Committee Challenge Claims hereunder, on or after the Effective Date, upon the entry of a final judgment or settlement of any of the 2007 Bond Causes of Action, the Bond Trustee or the majority Holder of the 2007 Bonds shall transfer one hundred percent (100%) of the net proceeds of such judgment and/or settlement to the Liquidating Trust for Distribution in accordance with sections IV.B.3.a-c and IV.B.5

### 10.    Use of Existing Accounts

The Liquidating Trustee may use the Debtors' existing bank accounts (as of the Effective Date) for the purposes set forth herein, to the extent possible and desired. The Liquidating Trustee also may close the Debtors' existing bank accounts, at its discretion, and transfer all amounts therein to one or more accounts, in accordance with the terms of the Plan. Alternatively, notwithstanding any provisions to the contrary in the Plan, the Liquidating Trustee may invest some or all of the funds that would otherwise be deposited into the accounts established pursuant to the Plan in allowed investments under applicable non-bankruptcy law.

11.     **Employment and Compensation**

The Liquidating Trustee shall serve without bond and shall receive compensation for serving as Liquidating Trustee as set forth in the Liquidating Trust Agreement.  At any time after the Effective Date and without further Order of the Bankruptcy Court, the Liquidating Trustee may employ Persons or Entities, including Professionals (which may, but need not, include Professionals previously or currently employed in the Chapter 11 Cases) reasonably necessary to assist the Liquidating Trustee in the performance of his duties under the Liquidating Trust Agreement and the Plan.  Such Persons or Entities shall be compensated and reimbursed by the Liquidating Trustee for their reasonable and necessary fees and out of pocket expenses on a monthly basis in arrears.

12.     **Vesting of Authority in Debtor Representative**

Upon the Effective Date, the Debtors' board of directors shall be dissolved and the then-current members of the board of directors and officers of the Debtors shall be relieved of their positions and corresponding duties and obligations; provided, however, that the Debtor Representative shall be responsible for effectuating transfers of Assets in accordance with the Plan and otherwise satisfying the Debtors' obligations under the terms of the Plan.  On and after the Effective Date, the Debtor Representative shall have full and complete authority to act on behalf of and bind the Debtors without further action or approval of the Bankruptcy Court or the board of directors of the Debtor.  After the D&O Claims and 2007 Bond Causes of Action are liquidated and the proceeds of such Causes of Action are transferred to the Liquidating Trust Estates in accordance with the Plan, the Debtor Representative shall be empowered, but not directed, to effectuate the dissolution of the Debtors in accordance with the laws of the State of West Virginia.

G.     **Termination of the Committee; Creation of Plan Oversight Committee**

On the Effective Date, the Committee shall be dissolved, the retention and employment of the Committee's Professionals shall terminate and the members of the Committee will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, other than for purposes of filing and/or objecting to final Fee Applications filed in the Chapter 11 Cases.

On the Effective Date, the Committee shall be replaced by the Plan Oversight Committee (the "**POC**") that shall consist of not less than three (3) Persons or Entities that are Beneficiaries of the Liquidating Trust, and shall include at least one member of Class 3 or a delegate chosen by a majority of the Holders of Allowed Class 3 Claims.  The identities of the Persons and/or Entities that will serve on the POC as of the Effective Date will be filed by the Committee with the Court no later than five (5) days before the Confirmation Hearing.  The POC may also include such other Persons or Entities (including ex officio members) as may be requested by the POC, which Persons or Entities shall have agreed to participate in the performance of the POC's functions as set forth in the Plan.  The POC's sole function and responsibility shall be to advise and instruct the Liquidating Trustee in the performance of the Liquidating Trustee's duties and obligations under the Plan with respect to the liquidation of Assets for the benefit of the Holders of Allowed Claims.  The members of the POC shall serve without compensation, but may be

reimbursed for reasonable expenses incurred in the performance of their duties as members of the POC.

## H.      Liquidating Trustee as Successor in Interest to the Debtors and Committee

Except as to the D&O Claims, the Liquidating Trustee is the successor in interest to the Debtors and the Committee, and thus, after the Effective Date, to the extent the Plan requires an action by the Debtors (and except as it relates to the D&O Claims), the action shall be taken by the Liquidating Trustee on behalf of the Debtors and the Creditors' Committee, as applicable. The Liquidating Trustee may not materially amend or alter the terms and provisions of the Plan.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Liquidating Trustee and the Beneficiaries of the Liquidating Trust Estates) shall treat the transfer of Assets to the Liquidating Trust in accordance with the terms of the Plan, as a sale by the Debtors of such Assets to the Liquidating Trust Estates at a selling price equal to the fair market value of such Assets on the Effective Date. The Liquidating Trust shall be treated as the owner of all Assets that it holds.

## I.      Termination of the Liquidating Trust Estates

The existence of the Liquidating Trust and the authority of the Liquidating Trustee will commence as of the date of execution of the Liquidating Trust Agreement and will remain and continue in full force and effect until the earlier of (a) the date on which all of the Assets are liquidated in accordance with the Plan, the funds in the Liquidating Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities and the Order closing the Chapter 11 Cases is a Final Order or (b) five (5) years after the date of creation of the Liquidating Trust, unless extended by the Bankruptcy Court as provided in the Liquidating Trust Agreement.

At such time as the Liquidating Trust has been fully administered (i.e., when all things requiring action by the Liquidating Trustee have been done, and the Plan has been substantially consummated) and in all events within sixty (60) days after the Final Distribution Date, the Liquidating Trustee will file an application for approval of his final report and the entry of the final decree by the Bankruptcy Court.

## J.      Objections to Administrative Expense Claims and Priority Claims

### 1.      Objection Procedures

The Liquidating Trustee shall have standing and authority to object to the allowance of Administrative Expense Claims and Priority Claims.  No distribution shall be made pursuant to the Plan to a Holder of an Administrative Expense Claim or Priority Claim, Disputed or otherwise, unless and until such Claim becomes an Allowed Claim.

The Liquidating Trustee shall have one hundred and eighty (180) days after the Effective Date to object to each filed administrative expense claim and unsecured priority claim.  All objections to Administrative Expense Claims and Priority Claims must be filed with the Bankruptcy Court, and served upon the Holders of such Claims, on or before the one hundred

and eightieth (180th) day after the Effective Date, except as extended by an agreement between the claimant and the objecting party, or by Order of the Bankruptcy Court upon a motion filed by the Liquidating Trustee or the Bond Trustee.  If an objection has not been filed to a proof of Claim for an Administrative Expense Claim or Priority Claim within this 180-day period, or the extension of such period, the Administrative Expense Claim or Priority Claim to which the proof of Claim relates shall be treated as an Allowed Claim for purposes of distribution under the Plan; provided, however, that if the Holder of the Administrative Expense Claim or Priority Claim is a Debtor under any chapter of the Bankruptcy Code, the deadline shall be thirty (30) days after the Liquidating Trustee obtains relief from stay or other relief that will permit the filing of an objection to such Claim.

**2.     Resolution of Disputed Administrative Expense Claims and Priority Claims and Administrative Expense Claims and Priority Claims that have Not Otherwise Been Allowed**

The Liquidating Trustee shall have the right to settle or otherwise compromise any Administrative Expense Claim or Priority Claim and shall use reasonable best efforts to resolve disputes regarding such Claims.  If the Bond Trustee or any other Creditor disputes a proposed settlement or other compromise of an Administrative Expense Claim or Priority Claim, the Liquidating Trustee may seek Bankruptcy Court approval of the proposed resolution, after notice and a hearing, upon a showing that such resolution is fair and equitable with respect to the Estates.

Until such time as an unliquidated Administrative Expense Claim or Priority Claim, contingent Administrative Expense Claim or Priority Claim, or a contingent portion of an Administrative Expense Claim or Priority Claim becomes Allowed or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions. The Holder of an unliquidated or contingent Administrative Expense or Priority Claim will be entitled to a distribution under the Plan only when and if such unliquidated or contingent Claim becomes an Allowed Claim.

**K.     Objections to Other Claims**

From and after the Effective Date, the Liquidating Trustee shall have the right and standing to (i) object to and contest the allowance of all Claims that are not Administrative Expense Claims or Priority Claims (the "**Other Claims**"), (ii) compromise and settle any Disputed Other Claim or Other Claim that has not otherwise been Allowed without Bankruptcy Court approval, subject to the notice procedure set forth in section VII.P.2; and (iii) litigate to final resolution objections to Other Claims.

**No distribution shall be made pursuant to the Plan to a Holder of an Other Claim, Disputed or otherwise, unless and until such Other Claim is or becomes an Allowed Claim.**

All objections to Other Claims must be filed with the Bankruptcy Court, and served upon the Holders of such Claims, on or before the one hundred eightieth (180th) day after the Effective Date, except as extended by an agreement between the claimant and the Liquidating Trustee or by Order of the Bankruptcy Court upon a motion filed by the Liquidating Trustee.

Such deadline shall be automatically extended upon the filing of any motion to extend such deadline through and including any Final Order resolving any such motion. If an objection has not been filed to a proof of Claim for an Other Claim within this 180-day period or the extension of such period, the Other Claim to which the proof of Claim relates shall be treated as an Allowed Claim for purposes of distribution under the Plan; provided, however, that if the Holder of the Other Claim is a Debtors under any chapter of the Bankruptcy Code, the deadline shall be thirty (30) days after the Liquidating Trustee obtains relief from stay or other relief that will permit the filing of an objection to such Claim.

## L.    Resolution of Disputed Other Claims and Other Claims that Have Not Otherwise Been Allowed

If the Holder of a Disputed Other Claim or Other Claim that has not otherwise been Allowed and the Liquidating Trustee agree to a settlement of such Claim for an amount that does not exceed $100,000, the Liquidating Trustee shall be authorized to enter into and effectuate such settlement without any further notice or approval of the Bankruptcy Court, and the settled Claim shall be deemed an Allowed Claim.  If the Holder of such a Claim and the Liquidating Trustee agree to a settlement of such Claim and the settlement amount exceeds $100,000, the Liquidating Trustee shall provide notice of the proposed settlement (with a fourteen-day (14) period to object) to the Persons or Entities on the Post-Effective Date Notice List.  If no objection is received within the fourteen-day (14) period, the settled Claim shall be deemed to be an Allowed Claim, without the need for further review by or approval of the Bankruptcy Court or any other party.  If an objection to a proposed settlement is received within the 14-day period and such objection cannot otherwise be resolved, then the Liquidating Trustee shall schedule a hearing in the Bankruptcy Court to resolve the objection.

Until such time as an unliquidated Other Claim, contingent Other Claim, or a contingent portion of an Other Claim becomes Allowed or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions. The Holder of an unliquidated or contingent Other Claim will be entitled to a distribution under the Plan only when and if such unliquidated or contingent Claim becomes an Allowed Claim.

## M.    Provisions Governing Distributions

**1.    Delivery of Distributions.**  Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on the records of the Debtor, or a filed proof of Claim, as applicable.

**2.    Undeliverable Distributions.**  If any Allowed Claim Holder's Distribution is returned as undeliverable, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then-current address. Undeliverable Distributions shall remain in the possession of the Liquidating Trustee until such time as a Distribution becomes deliverable.  Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind.  Within twenty-one (21) days after the end of each calendar quarter following the Effective Date, the Liquidating Trustee shall make all Distributions that become deliverable during the preceding calendar quarter, except as otherwise

provided herein.  Any check that is not cashed or otherwise deposited within three months after the check's date shall be deemed an undeliverable distribution under this Plan.

      **3.**     **Failure to Claim Undeliverable Distributions.**  In an effort to ensure that all Holders of Allowed Claims receive their allocated Distributions, the Liquidating Trustee will file with the Bankruptcy Court a listing of unclaimed Distribution Holders.  This list will be maintained and updated as needed for as long as the Chapter 11 Cases stay open.  Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable Distribution within three (3) months after the first attempted delivery shall have its Claim for such undeliverable Distribution discharged and shall be forever barred from asserting any such Claim against the Debtor, the Liquidating Trust Estates, or the Liquidating Trustee, or their respective property.  In such cases, any Cash held for Distribution on account of such Claims shall be property of the Liquidating Trust Estates, free of any restrictions thereon, and shall revert to the account from which such payment was originally issued to be distributed pursuant to the Plan.  Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

      **4.**     **Compliance with Tax Requirements.**  In connection with the Plan, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued on such Claims.

      <u>**Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is not to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon any disbursing agent in connection with such distribution.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution under the Plan.**</u>

      **5.**     **Minimum Distributions.**  If the amount of Cash to be distributed to the Holder of an Allowed Claim is less than $50 on a particular Distribution Date, the Trustee may hold the Cash Distributions to be made to such Holder until the aggregate amount of Cash to be distributed to such Holder is in an amount equal to or greater than $50.  Notwithstanding the preceding sentence, if the aggregate amount of Cash Distribution owed to any Holder of an Allowed Claim never equals or exceeds $50, then the Liquidating Trustee shall not be required to distribute Cash to any such Holder.

      **6.**     **Rounding.**  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.

7.    **Setoffs and Recoupments.**  The Liquidating Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, exercise the right of setoff or recoupment against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Claim (before Distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Allowed Claim; provided, however, that (i) neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trustee of any such claims, rights and causes of action that the Liquidating Trust may possess against such Holder and (ii) no such setoff or recoupment shall be in derogation of the APA.

8.    **Settlement of Claims and Controversies.**  Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and is fair, equitable and reasonable.  Without limiting the foregoing, the Plan shall constitute a good faith settlement and compromise of the Committee Challenge Claims with respect to the 2007 Bond Claim and the Liens and security interests associated therewith.

## N.    Procedures For Treatment Of Disputed Claims And Claims That Have Otherwise Not Been Allowed

1.    **Payments and Distributions on Disputed Claims and Claims That Have Otherwise Not Been Allowed.**  Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Liquidating Trustee, in its sole discretion, no partial payments and no partial distributions will be made with respect to a Disputed Claim or Claim that has otherwise not been Allowed until such disputes are resolved by settlement or Final Order and the Claim has been Allowed.  Notwithstanding the foregoing, any Person or Entity who holds both an Allowed Claim(s) and a separate and distinct Disputed Claim(s) or Claim that has otherwise not been Allowed will receive the appropriate payment or distribution on account of the Allowed Claim(s), although, except as otherwise agreed by the Liquidating Trustee in his sole discretion, no payment or distribution will be made on the Disputed Claim(s) or Claim(s) that have otherwise not been Allowed until such dispute is resolved by settlement or Final Order and the Claim(s) have been Allowed.  In the event there are Disputed Claim(s) or Claim(s) that have otherwise not been Allowed requiring adjudication and resolution, the Liquidating Trustee reserves the right, or upon order of the Bankruptcy Court, to establish appropriate reserves for potential payment of such Claims.

2.    **Safekeeping of Distributable Property.**  Pending entry of a Final Order determining an objection to any Disputed Claim, the Liquidating Trustee shall take appropriate steps to safeguard the Cash, notes or other instruments that would be distributed on account of such Claim if Allowed, but the Liquidating Trustee shall not be required to establish any formal escrow or reserve for such distributable property unless it determines, or the Bankruptcy Court

orders, that an escrow or reserve is necessary to ensure that such property is available if and when such Claim is Allowed.

       **3.**     **Allowance of Claims.**  Except as expressly provided herein or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim.  Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Liquidating Trust Estates on and after the Effective Date will have and retain any and all rights and defenses the Debtors had with respect to such Claim as of the Petition Date.

## O.     Jurisdiction

       **1.**     **Retention of Jurisdiction.**  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Cases until the Chapter 11 Cases are closed, including jurisdiction to issue any other Order necessary to administer the Estates or the Liquidating Trust Estates and enforce the terms of the Plan, and/or the Liquidating Trust Agreement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

       **a.**     To determine the type, allowance and payment of any Claims upon any objections thereto (or other appropriate proceedings) by the Liquidating Trustee or any other party-in-interest entitled to proceed in that manner;

       **b.**     Except as otherwise limited herein, to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located;

       **c.**     To hear and determine any issue arising under the Plan; provided, however, any action, controversy, dispute, claim or question arising out of or relating to the right of any party to enforce, contest and/or litigate the existence, primacy and/or scope of available coverage and/or any defenses to coverage under the Insurance Policies shall be referred to and resolved solely in accordance with the terms and conditions of the Insurance Policies and applicable non-bankruptcy law, including, but not limited to, any choice of law, forum or jurisdiction provision therein;

       **d.**     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

       **e.**     To hear any other matter not inconsistent with the Bankruptcy Code;

       **f.**     To enter a final decree closing the Chapter 11 Cases;

       **g.**     To ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

h.       To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on or instituted by the Liquidating Trustee after the Effective Date;

i.       To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

j.       To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

k.       To enforce, interpret, and determine any disputes arising in connection with any stipulations, Orders, the Sale Order, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

l.       To adjudicate any adversary proceeding or other proceeding which may be commenced against any Person or Entity arising from, related to, or in connection with (i) any Chapter 5 Action; (ii) the D&O Claims; (iii) 2007 Bond Causes of Action; and (iii) claims against third parties relating to the facts and circumstances surrounding the same; provided, however, that nothing in the Plan or the Confirmation Order shall vest the Bankruptcy Court with exclusive jurisdiction over any claims identified in subclauses (ii) through (iii) of this subparagraph (l) or over any dispute relating to coverage under the D&O Policies;

m.       To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

n.       To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Claims Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is discharged hereunder or for any other purpose.

2.       **Consent to Jurisdiction.**  All creditors who have filed claims in the Chapter 11 Cases shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for purposes of the Causes of Action.

## P.       Treatment Of Executory Contracts And Unexpired Leases

1.       **Rejection of Executory Contracts and Unexpired Leases.**  On the Effective Date and subject to section VI.A and VI.C of the Plan, all Executory Contracts and unexpired leases of the Debtors will be deemed rejected, as of the Effective Date, other than: (i) Executory Contracts and unexpired leases that were previously assumed, assumed and assigned or rejected by Final Order of the Bankruptcy Court (which contracts will be treated in accordance with such

Final Order); and (ii) Designated Contracts.  The Confirmation Order will constitute an Order approving the foregoing.

      **2.**      **Bar Date for Rejection Damages.**  If the rejection of an Executory Contract or unexpired lease pursuant to the Plan and the Confirmation Order or a previous or subsequent order of the Court gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Trust, or the Estates unless a proof of Claim is filed and served on the Debtors or the Liquidating Trust, as the case may be, and its counsel within thirty (30) days after the Confirmation Date.  All such Claims for which proofs of Claim are required to be filed for contracts in which FGH is a party, if Allowed, will be classified and treated as Class 5 General Unsecured Claims, subject to the provisions of the Plan.  All such Claims for which proofs of Claim are required to be filed for contracts in which FPI is a party, if Allowed, will be classified and treated as Class 6 General Unsecured Claims, subject to the provisions of the Plan.

      **3.**      **Insurance Policies.**  For the avoidance of doubt, the Debtors' rights with respect to all Insurance Policies under which either of the Debtors may be a beneficiary (including all Insurance Policies that may have expired prior to the Petition Date, all Insurance Policies in existence on the Petition Date, all Insurance Policies entered into by the Debtors after the Petition Date, and all Insurance Policies under which either of the Debtors holds rights to make, amend, prosecute and benefit from claims) shall revest in the Debtor Representative as necessary to pursue and prosecute any Causes of Action and to the extent that any Insurance Policies are not necessary for the pursuit and prosecution of any Causes of Action, all such Insurance Policies shall be transferred to the Liquidating Trust from the Effective Date until its dissolution, unless any such Insurance Policy is otherwise cancelled by the Liquidating Trustee in its discretion. Notwithstanding any provision providing for the rejection of Executory Contracts, any Insurance Policy that is deemed to be an Executory Contract shall neither be rejected nor assumed by operation of the Plan and shall be the subject of a specific motion by the Liquidating Trust, which shall retain the right to assume or reject any such Executory Contracts pursuant to and subject to the provisions of section 365 of the Bankruptcy Code following the Effective Date.

      The Confirmation Order shall constitute a determination that no default by the Debtors exists with respect to any of the Insurance Policies requiring Cure and that nothing in the Sale Order, any underlying agreements or the Plan shall be construed or applied to modify, impair or otherwise affect the enforceability of the Insurance Policies or any coverage thereunder with regard to any Claims, including the D&O Claims.  The Plan shall be liberally construed to protect the interests of all Creditors in all Causes of Action and to limit any Claims against the Estates.

**Q.**      **Releases, Exculpations And Related Provisions**

      **1.**      **Term of Bankruptcy Injunction or Stay.**  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, except for any injunction in the Sale Order which shall remain in full force and effect until then and at all times after the Effective Date.  Except as otherwise expressly provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order or a

separate Order of the Bankruptcy Court, as of the Effective Date, all entities who have held, hold, or may hold Claims against the Debtors, are permanently enjoined, on and after the Confirmation Date, from (A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the claims allowance procedure discussed in the Plan and the Bankruptcy Code and Bankruptcy Rules, (B) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtors, the Liquidating Trust or the Liquidating Trustee on account of any such Claim, (C) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim and (D) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim.  Such injunction shall extend for the benefit of the Debtor Representative, the Liquidating Trustee and any successors of the Debtors, and to any property and interests in property subject to the Plan.

      **2.**    **Exculpation.**  Except to the extent arising from willful misconduct or gross negligence, any and all claims, liabilities, causes of action, rights, damages, costs and obligations held by any party other than the United States of America against the Debtor, the Committee and its members, the POC and its members, the Bond Trustee, and/or each of their respective attorneys, accountants, agents and other professionals, whether known or unknown, matured or contingent, liquidated or unliquidated, existing, arising or accruing, whether or not yet due in any manner related to or in connection with (i) the Chapter 11 Cases or any act or omission in connection with, arising out of, or related to the Chapter 11 Cases, (ii) any act or omission in connection with, arising out of, or related to the Sale, (iii) the formulation, negotiation, prosecution or implementation of the Plan, (iv) the solicitation of acceptances of the Plan, or (v) the Confirmation, consummation  or implementation of the Plan, will be deemed fully waived, barred, enjoined, released and discharged in all respects, except as to rights, obligations, duties, claims and responsibilities preserved, created or established by terms of the Plan.

      **3.**    **Limitation on Liability of Liquidating Trustee and Debtor Representative.**  Neither the Liquidating Trustee or the Debtor Representative will be liable for any act he may do or omit to do as Liquidating Trustee or Debtor Representative under the Plan and the Liquidating Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will the Liquidating Trustee or the Debtor Representative be liable in any event except for gross negligence, willful fraud or willful misconduct.  The foregoing limitation on liability also will apply to any Person (including any Liquidating Trustee Professional) employed by the Liquidating Trustee or Debtor Representative and acting on behalf of the Liquidating Trustee or Debtor Representative in the fulfillment of their respective duties hereunder or under the Liquidating Trust Agreement.  Also, the Liquidating Trustee and all Liquidating Trustee Professionals shall be entitled to indemnification out of the assets of the Liquidating Trust against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits or claims that the Liquidating Trustee or Debtor Representative may incur or sustain by reason of being or having been a Liquidating Trustee of the Liquidating Trust or Debtor Representative or for performing any functions incidental to such service; provided, however, that the foregoing shall not relieve the Liquidating Trustee, the Debtor Representative or the Liquidating Trustee's Professionals from liability for bad faith,

willful misfeasance, reckless disregard of duty, gross negligence, fraud, self-dealing or breach of fiduciary duty.

The Liquidating Trust is deemed to release each Person and Entity exculpated under this Subsection from any liability arising from any act or omission occurring after the Petition Date and in connection with, relating to or arising out of the Chapter 11 Cases, except as provided herein.

**4. Releases By the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtors and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtors' Chapter 11 Cases, the Sale, the transactions or events giving rise to any Claim that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims before or during the Debtors' Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement or any related agreements, instruments or other documents, other than a Claim against a Released Party arising out of the gross negligence or willful misconduct of any such person or entity.

**5. Releases by Holders of Claims.** ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THIS PLAN, ALL PERSONS WHO HAVE (I) VOTED TO ACCEPT THIS PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THIS PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE, (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND WHO VOTE TO REJECT THIS PLAN OR ABSTAIN FROM VOTING, AND (III) DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER SECTION XI.F OF THE PLAN, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES AND EACH OF THEIR RESPECTIVE CONSTITUENTS, PRINCIPALS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ATTORNEYS, PROFESSIONALS, ADVISORS, AFFILIATES, FUNDS, SUCCESSORS, PREDECESSORS, AND ASSIGNS, OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTOR, THE CHAPTER 11 CASES OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO THE DEBTOR,

AGAINST SUCCESSORS OR ASSIGNS OF THE DEBTORS AND THE INDIVIDUALS AND ENTITIES LISTED ABOVE WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THIS PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALE. THE CONSUMMATION OF THIS PLAN OR THE ADMINISTRATION OF THIS PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THIS PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM HAS VOTED TO ACCEPT OR REJECT THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS PLAN.

6.     **Injunction.**  FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.

7.     **Nondischarge of the Debtors.**  In accordance with section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan any Claims, rights, causes of action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

8.     **Cancellation of Documents.**  On the Effective Date, except to the extent otherwise provided in the Plan, any and all notes, instruments, debentures, certificates and other documents evidencing Claims against the Debtors including, without limitation, the Bond Documents, shall be deemed inoperative and unenforceable solely as against the Debtors and its Estates; provided, however, that (1) the Bond Documents shall continue in effect for purposes of allowing Holders of the Bonds to receive Distributions under the Plan and (2) the Bond Documents shall remain operative and enforceable with respect to any Person, other than the Debtors, which has rights and/or obligations thereunder, except with respect to the releases and exculpations set forth in Article XI of the Plan.

**9.    Effect of Plan on Released Claims and Liens.**  Nothing contained in the Plan shall revive, preserve, or transfer any Claims or Liens that have been released pursuant to the Sale Order, the APA, or otherwise.

**R.    Miscellaneous Provisions**

**1.    Conditions to Confirmation and the Effective Date.**  The following are conditions precedent to the occurrence of Confirmation and the Effective Date, each of which must be satisfied or waived in writing:

      **a.**    the Confirmation Order, authorizing and directing that the Debtors take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan and the transactions contemplated thereby, including, without limitation, the transactions contemplated by the Liquidating Trust Agreement, shall have been entered and become a Final Order;

      **b.**    the Liquidating Trustee shall have accepted, in writing, the terms of his service and compensation, and such terms and compensation shall have been approved by the Bankruptcy Court in the Confirmation Order;

      **c.**    the Liquidating Trust shall have been established; and

      **d.**    all other actions, authorizations, consents and regulatory approvals required (if any) and necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Debtors and the Committee or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

**2.    Effect of Failure of Condition.**  If each condition to the Effective Date has not been satisfied or duly waived within thirty (30) days after the Confirmation Date, then (unless the period for satisfaction or waiver of conditions has been extended at the joint option of the Plan Proponents for a period not exceeding sixty (60) days) upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Plan Proponents or the Liquidating Trustee, as the case may be, before the Bankruptcy Court enters a Final Order granting such motion.  If the Confirmation Order is vacated pursuant to the Plan, the Plan shall be deemed null and void in all respects, and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Debtors or (B) prejudice in any manner the rights of the Debtors or the Committee.

**3.    Waiver of Conditions to Confirmation and Effective Date.**  The Debtors and the Committee, jointly and in their sole discretion, may waive any or all of the conditions to Confirmation and the Effective Date, in whole or in part, at any time, without notice or an Order of the Bankruptcy Court. In that event, the Debtors and the Committee will be entitled to render any or all of their performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right

to perform under any circumstances which would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge. The failure to satisfy or to waive any condition may be asserted by the Debtors or the Committee regardless of the circumstances giving rise to failure of such condition to be satisfied (including any action or inaction by the Debtor). The failure of the Debtors or the Committee to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right that may be asserted at any time.

4.      **Modification of the Plan.**  The Plan and any Exhibits thereto may be modified jointly by the Plan Proponents, or the Liquidating Trustee, as applicable, from time to time in accordance with Bankruptcy Code section 1127 and Bankruptcy Rule 3019.  The Plan and any Exhibits thereto may be modified at any time before the entry of the Confirmation Order pursuant to section 1127(a) of the Bankruptcy Code; and after the entry of the Confirmation Order, the Plan Proponents, or the Liquidating Trustee, as applicable may, upon Order of the Bankruptcy Court, amend or modify the Plan and any Exhibits thereto in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

Objections with respect to any amendments or modifications to the Plan (as and to the extent permitted hereby) filed after the deadline for objections to the Plan, as set by the Bankruptcy Court, may be brought at the Confirmation Hearing.  The Plan, and any modification or supplement thereof, may be inspected in the Office of the Clerk or its designee during normal business hours.  Holders of Claims may obtain a copy of the Plan and any supplement or modification, if any, by contacting the solicitation agent, Epiq, at (646) 282-2400 or by reviewing such document on the internet at *http://www.epiq11.com*.  The documents annexed to the Disclosure Statement or contained in any modification or supplement to the Plan or the Disclosure Statement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

5.      **Extension of Time.**  For cause shown, any deadlines herein which are applicable to the Debtors or the Liquidating Trust Estates and which are not otherwise extendable, may be extended by the Bankruptcy Court.

6.      **Post-Effective Date Notice List.**  Because certain Persons may not desire to continue to receive notices after the Effective Date, the Plan provides for the establishment of a Post-Effective Date Notice List.  Persons on such Post-Effective Date Notice List will be given certain notices and in some cases an opportunity to object to certain matters under the Plan (as described herein).  Any Person desiring to be included in the Post-Effective Date Notice List must (i) file a request to be included on the Post-Effective Date Notice List and include thereon its name, contact person, address, telephone number and facsimile number, within thirty (30) days after the Effective Date, and (ii) concurrently serve a copy of its request to be included on the Post-Effective Date Notice List on the Liquidating Trustee and his counsel.  On or before sixty (60) days after the Effective Date, the Liquidating Trustee shall compile a list of all Persons on the Post-Effective Date Notice List and file such list with the Bankruptcy Court.  Those

parties set forth in section XII.J of the Plan shall be included in the Post-Effective Date Notice List without the necessity of filing a request.

7. **Revocation of Plan.** The Plan Proponents reserve the right to jointly revoke or withdraw the Plan prior to the Effective Date and to jointly file subsequent plans of reorganization or liquidation.  If the Plan is withdrawn or revoked, or if confirmation or the Effective Date of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or leases affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and except as herein provided and as provided in the Settlement Agreement or the Sale and Settlement Order (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors or any other person, (ii) prejudice in any manner the Debtors' or any other Person's rights, or (iii) constitute the Debtors' or any other Person's admission of any sort.

8. **Successors and Assigns.** The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, and lawful successor or assign of such Person or Entity.

9. **Reservation of Rights.** Except as expressly set forth herein, the Plan shall have no force or effect until the Bankruptcy Court has entered the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained in the Plan, nor the Debtors' taking of any action with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any of the Debtors' rights with respect to the Holders of Claims prior to the Effective Date.

10. **Filing of Additional Documents and Notice of Effective Date.**  On or before the Effective Date, the Debtors and/or the Committee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Liquidating Trustee shall file a notice of the Effective Date as soon as practicable after the Effective Date and shall serve such notice on all parties that are entitled to notice under Bankruptcy Rule 2002.

11. **Severability.**  The provisions of the Plan shall not be severable unless the Plan Proponents agree to such severance and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

12. **Entire Agreement.**  The Plan, and any supplements or amendments hereto, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects (other than the Liquidating Trust Agreement), all of which have become merged and integrated into the Plan.

13. **Governing Law.**  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of West Virginia, without giving effect to the principles of conflicts of law of such jurisdiction.

**14.    Closing of the Chapter 11 Cases.**  The Liquidating Trustee shall promptly, upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable Order of the Bankruptcy Court to close the Chapter 11 Cases.

## IV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe the Plan is in the best interests of the Creditors and should accordingly be accepted and confirmed.  If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtors: (i) a liquidation of the Debtors' Assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative plan of liquidation may be proposed and confirmed; or (iii) the Debtors' Chapter 11 Cases may be dismissed.

## A.    Chapter 7 Liquidation

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtors' Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that such a liquidation would result in smaller distributions being made to the Debtors' Creditors than those provided for in the Plan because (a) the likelihood that other Assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.  The Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## B.    Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtors' Assets. However, it is difficult to speculate on or assess the terms and potential treatment of Allowed Claims under any such alternative plan.  Furthermore, in order for the Debtors and/or Creditors to formulate, solicit and confirm any such alternative plan would likely require the Estates to incur additional administrative and other expenses, may substantially delay distributions to Creditors, and may result in lower recoveries to Creditors than the proposed Plan.  The Debtors believe that the terms of the Plan provide for an orderly and efficient liquidation of the Debtors' Assets and will result in the realization of the most value for Holders of Claims against the Debtors' Estates.

C.    **Dismissal of the Debtors' Chapter 11 Cases.**

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Debtors' Chapter 11 Cases would permit secured creditors to foreclose upon any Assets that are subject to their Liens.  Dismissal would also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors.  The Debtors believe that these actions could lead ultimately to the liquidation of the Debtors' Assets under chapter 7 of the Bankruptcy Code.  Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a preferable alternative to the Plan.

## V.    CERTAIN FEDERAL TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **General**

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtors, the Liquidating Trust and Holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**").  There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or

will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, the Liquidating Trust or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

## B.    U.S. Federal Income Tax Consequences to the Debtors

Fairmont is a not-for-profit corporations that are exempt from federal income taxation under 501(c)(3) of the IRC. It is intended that nothing in the Plan shall adversely affect the tax-

exempt status of Fairmont.  Accordingly, the Debtors do not expect the implementation of the Plan to have any adverse federal income tax consequences on the Debtors before or after the Effective Date.  If the tax-exempt status of Fairmont would terminate, Fairmont may be subject to tax on its income, which would reduce the amount of distributions payable to the Holders of Claims.

## C.      U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes.  In general, a grantor trust is not a separate taxable entity.  The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Debtors are not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust.  Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Debtors' Assets to the Liquidating Trust as (i) a transfer of such assets to the Beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such assets by such Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the beneficiaries of the Liquidating Trust being treated as the grantors and owners of the Liquidating Trust.  Each beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim.  The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim.  A Holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the Beneficiaries of the Liquidating Trust must value the assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes.  As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the assets transferred to the Liquidating Trust.

Consistent with the treatment of the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement and the Plan will require each Holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income.  Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such Holder.  The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying assets from the Liquidating Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S.

federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

The Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the Service were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

**D.     U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust.**

Holders of Allowed Claims as of the Effective Date that are Beneficiaries of the Liquidating Trust should be treated as receiving from the Debtors their respective shares of the applicable assets of the Liquidating Trust in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the assets of the Liquidating Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the assets of the Liquidating Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules

(subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the assets of the Liquidating Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Liquidating Trust.

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Liquidating Trust Assets are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust Assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear. The Debtors and the Liquidating Trust intend to take the position, and the Plan provides, that such cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## VI.      RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Claims against the Debtors should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.       Bankruptcy Considerations

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in the Plan, and there can be no assurance that such conditions will be satisfied or waived.  In the event the conditions precedent described in the Plan have not been satisfied, or waived (to the extent possible) by the Plan Proponents or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides that certain Classes are to receive Additional Cash, which will be generated, in part, by the liquidation of certain Assets and the prosecution of certain Causes of Action.  The potential recoveries from such actions, however, are unknown.  In addition, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay the fees and expenses of the Liquidating Trustee or make any Distributions to the Beneficiaries.

As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes.  The Plan Proponents believe that the Plan satisfies these requirements.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.       No Duty to Update Disclosures

The Plan Proponents have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponents are required to do so pursuant to an order of the Bankruptcy Court.  Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.      Representations Outside this Disclosure Statement**

This Disclosure Statement contains representations concerning or related to the Debtors and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court.  Please be advised that any representations or inducements made outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

**D.      No Admission**

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Plan Proponents, the Liquidating Trustee or Holders of Claims and Interests.

**E.      Tax and Other Related Considerations**

A discussion of potential tax consequences of the Plan is set forth in this Disclosure Statement.  However, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice.  Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## VII.      <u>RECOMMENDATION AND CONCLUSION</u>

The Debtors and the Committee believe the Plan provides the best available alternative for maximizing the recoveries that Creditors may receive from the Estate.  Therefore, the Debtors and the Committee recommend that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

Dated:  February 27, 2015

FAIRMONT GENERAL HOSPITAL, INC.


By: _/s/ Margaret C. Coster_
Name:  Margaret C. Coster
Title: Chief Executive Officer


FAIRMONT PHYSICIANS, INC.


By: _/s/ Margaret C. Coster_
Name: Margaret C. Coster
Title: Chief Executive Officer


OFFICIAL COMMITTEE OF UNSECURED CREDITORS


By: _/s/ Brad Hamman_
Name: Brad Hamman
Title: Chairman